# EXHIBIT A

# Deposition Transcript

Case Number: 1:21-cv-01349-LHR
Date: July 17, 2026

In the matter of:

# DORA SOLARES v JOSEPH BURNES, et al.

## JACOB FUGATE

## CONFIDENTIAL - AEO

CERTIFIED COPY

Reported by:
Jori L. Moore

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

A. Correct.
Q. How long did you work at 3C third watch?
A. I was on and off on that yard for two years up until like, I want to say the end of -- closer to the end of 2018. And that's when I got into the ISU.
Q. So when did you start working in the ISU?
A. It was late 2018, I believe.
Q. Late 20 when?
A. 2018.
Q. Okay. So I'm just -- I'm a little unclear on the timing here. So January 2015 you start at CSP Corcoran, you work there, so 2015, 2016, 2017? And then you start at third watch in 2018?
A. No, I had -- I had been regularly on that yard probably for two years, but it wasn't like an everyday thing. I was out there the majority of the week. They just -- they put you in an -- it's a regular day off position to where certain days you're on certain yards. So there would be two or three days I'd be on 3C yard and then the other two days I would be on 3D yard. I was just trying to say I was on 3C facility the majority of my time.
Q. Okay. But -- so your -- you were -- the majority of your time you were at 3C, but you weren't assigned to 3C?

A. No, not until the beginning of 2018.
Q. So then when you are assigned to just 3C, that's in the beginning of 2018 and then in late 2018 you began at ISU?
A. I honestly could not tell you the day or the month that I got into ISU. It was towards the middle of 2018, if I can remember right.
Q. But you're sure it was 2018?
A. Yeah.
Q. Okay. What was your job title at ISU?
A. I was -- I was doing -- number one, they assign you numbers there. I was ISU squad number 1. I was the radio liaison, so I handled the institution radios. And I was assigned to facility 3C, so any incidents that happened on 3C I responded.
Q. What training did you receive to work in the ISU?
A. I didn't receive any training to get into ISU. I was -- basically like the more you process the evidence the more you're on the yard. They kind of put your name in a hat when they got a position. So they interviewed and hired me just due to my work ethic.
Q. Did you hold any other titles in ISU1?
A. No.

Q. Did you ever work as an evidence officer?
A. I was a backup. I wasn't assigned. I was just a backup.
Q. When did you work as a backup evidence officer?
A. I mean, they assigned -- they assign a backup for every position. It's just if the main one -- like, if the main evidence officer was not there I would do what needed to be done. If there was evidence to be pulled from, you know, to go to the yard to collect evidence, you know, if he wasn't available I had to do it.
Q. How often -- if you're the -- if -- okay -- I just want to get this clear in my head.
So you're assigned to ISU1 and you have a main job, but you have a second job and that's the backup evidence officer?
A. Yeah.
MS. GUPTA: Objection. Misstates testimony.
Q. That's accurate?
A. That's accurate.
Q. Okay. So -- and the -- I just didn't hear it, so your main job is called radio --
A. Liaison.

Q. -- liaison. Okay.
And then how does it work if your main job is radio liaison, then sometimes you have to fill in as an evidence officer?
MS. GUPTA: Objection. Calls for speculation. Lacks foundation. You can answer if you know.
A. Can you repeat the question?
Q. Yeah. If you're working as radio liaison how does it work when you work as an evidence officer?
MS. GUPTA: Same objections.
MR. ANDRADA: Objection. Vague and ambiguous. Overly broad.
MS. GUPTA: Join.
A. The only time I would have to actually step in as an evidence officer is if the main evidence officer was not there, which he hardly ever wasn't there. I rarely, like, had to ever step in to actually cover the main evidence.
Q. Okay. So you say that you -- some time in 2018 you transferred to ISU. And when you do that is your first job then as radio liaison? And you keep that job for many years when working at ISU?
A. It just -- it depends. Usually the newest guys get jobs like that. I was new with the most

say I left ISU in April or May of 2019. It might have been a little later. I don't know the exact date.

Q. Okay. And did you receive any training to serve as a backup evidence officer in the ISU?

A. No.

Q. What was your main job function as the backup evidence officer?

A. Every couple days the sub-evidence room -- across from the locked office is a sub-evidence room, so there's lockers in there that if any officers that are in different yards find contraband, they need to process the evidence, they bag, secure and lock it in those lockers. If the main officer was not available to clear the lockers and then process that evidence collected in the main evidence room, I did it.

Q. So in this time period wherein you're serving as a backup evidence officer, how many times a week would you estimate that you served -- that you would actually serve as a backup evidence officer because the main guy wasn't there?

A. Like I said, the main guy was rarely ever not there. So I -- maybe once a month if that.

Q. Got it. Okay.

And this -- so if it's maybe once a month and you're estimating that you served as the backup

MR. DARLING: Point two, you never put on the record that you would have an hour-long break after having delay of the start of this. So that's for the record.

Let's get going. Let's see how much progress we can make. And we'll cross that bridge later.

MS. GUPTA: Let's do that.

BY MR. DARLING:

Q. So, Mr. Fugate, are you ready to answer questions?

A. Yes.

Q. Okay. Cool.

So I want to turn our attention to March 9th, 2019. There's a crime that I know you're aware of, which is the homicide of an inmate with the last name Romero. You're familiar with that, correct?

A. Yes.

Q. Okay. And you were called in from your home or were you already on duty when you learned of the Romero homicide?

A. I was at home.

Q. Okay. And did they specifically call you in as an ISU evidence officer?

A. They called me in as it was a Saturday, there was only one. It's different now. But when I was in

the unit there was only one ISU on Saturday and one on Sunday. I was the Saturday.

Q. Okay. So then because you're the Saturday officer you are then assigned to serve as the evidence officer for the Romero homicide investigation?

A. My hours were 8:00 to 4:00. That day I got called about 7:00. But basically when on Saturday if any type of ISU is needed for gathering and processing evidence in a homicide it would be me.

Q. And you were designated as the photographer for the ISU investigation?

A. Yes.

Q. Was there anyone else given a camera to take photos of the crime scene?

MS. GUPTA: Calls for speculation. Lacks foundation. You can answer.

MR. ANDRADA: Join.

A. No.

Q. Were you the only evidence officer or was there other evidence workers working at the ISU investigation of the Romero homicide?

MS. GUPTA: Calls for speculation. Lack of foundation. You can answer.

MR. ANDRADA: Join.

MS. GUPTA: And vague as to time.

A. Yes, there was. I can't recall if it was. But I took photos. I didn't actually process any evidence. There were other ISU officers that were called in to help process the evidence in that cell.

Q. So just walk me through what you recall doing just at the point when you arrive at the crime scene.

MR. ANDRADA: Objection.

MS. GUPTA: Calls for a narrative. Vague. You can answer if you know.

MR. ANDRADA: Vague and ambiguous as to walk me through.

MR. DARLING: I know that you don't like that one, Randy.

MR. ANDRADA: No judge would let you ask a question using that phrase. My goodness.

MR. DARLING: I'm going to definitely disagree with you on basically direct examination. But we can continue.

A. You mean like showing up to like at my job from A to Z how I process a crime scene? Or what do you mean?

Q. Fair enough.

So first off, you arrive at Corcoran around what time?

A. I arrive before my start time so I could --

I don't know. And I can estimate maybe half an hour earlier, maybe around 7:30.

Q. Does your shift start early or you just arrive a half-hour early just sitting around?

MS. GUPTA: Objection. Misstates testimony. You can answer.

A. The weekend ISU officers are assigned 8:00 to 4:00 for visiting hours because normally that's where they're needed in is in the visiting room. So that's why I wasn't at the prison at 6:00.

So when Lieutenant Randolph called me, it was around 7:00, I believe. Told me what had happened and that I needed to respond, you know, get to work.

So I estimate it took me about a half an hour to get there.

Q. And when you say you got there, you mean CSP Corcoran?

A. Yes.

Q. What do you do? Do you put on -- do you grab any materials such as a camera?

A. Yeah. Every ISU officer has a camera they're issued once, you know, they join ISU. So I already had a camera. I just had to respond to the ISU office, get my equipment, and then respond to 4A yard. My lieutenant and my supervisor were already there, so

we processed the crime scene as a unit.

Q. So the Romero homicide crime scene was in 4A?

A. Correct.

Q. And how many ISU officers would you estimate were on -- were at the crime scene when you arrived?

A. If I remember correctly, there was -- I mean, we all arrived at the same time, but it was three of us plus our supervisors.

Q. And were you all in PPE kits?

A. Correct.

Q. And what is a PPE kit?

A. The white gown, the personal protective equipment.

Q. And why be in a PPE kit?

A. Because the cell was covered in blood.

Q. And you had a digital camera?

A. I did.

Q. Did anyone else with ISU have a digital camera?

A. As I stated earlier, every ISU officer has a camera issued that stays on their person.

Q. Were the other ISU officers taking photos?

MS. GUPTA: Calls for speculation. You can answer if you know.

A. No.

no weapon found at all.

Q. Okay. Just jumping ahead a bit.

After -- from when you first arrive, how long would you estimate that you were at the Romero crime scene before you leave 4A?

MR. ANDRADA: I'm sorry, I didn't hear the last part of it.

What -- Madame Reporter --

Q. How long were you at the crime scene at 4A?

A. From start to finish it -- I estimate four hours.

Q. Where did you go after you left the crime scene?

A. Directly back to the ISU office.

Q. And when you got to the ISU office did you download the camera's micro SD card to the work station?

A. I believe I took photos of the evidence collected.

Q. Okay.

A. We have a big, brown table in the middle of the ISU office, usually we do an overall like photo of the evidence collected. I believe I took photos of that, then I download them and started my -- the narrative for my report and started like actually

laying out the frames for the photos.
Q. So you started with your report that same day on March 9th?
A. If I recall, yes. It was a long day.
Q. Yeah.
Just focus on what you did with the images. Did you place all the photos you took, did you transfer them to a shared drive folder? I think you were referring to it as the squad share.
A. Yeah, I put them in the squad share folder.
Q. Okay. Please describe what you do to transfer from your camera to squad share.
MS. GUPTA: Calls for a narrative. You can answer.
MR. ANDRADA: Join.
A. The SD in the camera you, I mean, just download them on the computer, you create a folder inside the squad share, you drag all the photos into that folder and then label it with the image names of the incident, they get copied into that shared folder.
Q. Okay. And did you transfer every photograph that you took at the Romero homicide crime scene to the squad share folder?
A. I did.
Q. And you said you labeled them, what do you

mean by that?

A. The folder that's in it inside the squad share folder it get its own individual folder. And the Osuna and Romero name and the incident number just so, you know, that that was the Osuna homicide. But it had a bunch -- it -- there was a bunch of incident logs in there so you could just, you know, differentiate. You know, you could tell this was the incident from 4A. That's the one from 4B, you know.

Q. Okay. I'm going to show what will be marked Exhibit 7.

(Deposition Exhibit Number 7 marked for identification.)

Q. This is going to be marked DEF4096. It's a crime incident report. Do you see your name here at the top, Fugate?

A. I do.

Q. You see the incident log number here on the top right, COR-4A-19-[redacted]?

A. I do.

Q. And it's page one of six?

A. Uh-huh. Yes.

Q. So you drafted a written report summarizing what you did during the investigation on March 9th, 2019, correct?

A. Correct.
Q. And you recognize your signature here at the bottom of the page?
A. I do.
Q. And so is this the first page of the report that you drafted regarding the Romero homicide investigation?
A. It appears to be, yes.
Q. Showing you the second page. I see here at 4097 and that 4098 to the right, it says, this a frame by frame account of the photos I took. And it starts at frame 01. You see that?
A. I see it.
Q. And it goes down on page -- it says 4097 and it goes down to frame 30?
A. Yeah. Yes.
Q. Then on the next page at 4098 it starts at frame 31 at the top and goes down to frame 73. You see that?
A. Yep. I see it.
Q. So far this is all accurate? This is what you wrote down as summarizing all the digital photographs that you took at the Romero crime scene?
A. Correct.
Q. I'll move it down to 4099. At the top it

you wouldn't disagree with the fact that it could have been 205?
A. I believe I did. If I remember correctly, I think I did a supplemental with the autopsy photos later. I might be wrong.
Q. Okay.
A. That's probably why I'm thinking it was around the 250 mark because I had to add those after.
Q. Okay. So the report -- the initial crime/incident report that you drafted describes frames one through 205?
A. Correct.
Q. Okay. Then you're saying then you did a supplemental report?
A. Yes. I believe so.
Q. Okay. Then why do a supplemental report rather than just including it all in?
A. Because they wanted that report done before we left. And the autopsy didn't happen until I estimate like maybe a few days later, a week later.
Q. So the supplemental report is of the autopsy?
A. Yes.
Q. And so before we move on, not talking about a later day, but I want to focus on the photographs that you took on March 9th. You labeled -- you labeled all

these photos that you put in to squad share as the Osuna homicide?

A. I believe it was Osuna/Romero homicide with the incident number.

Q. Okay. And this is the normal occurrence that's done in every ISU case, the way you transferred the digital files?

MR. ANDRADA: Calls for speculation. Vague and ambiguous.

MS. GUPTA: Join.

A. Correct. Yes.

Q. Could you say what you did in terms of uploading the crime scene photos to the shared drive was within CDCR policy?

MS. GUPTA: Calls for speculation. Lacks foundation as to CDCR policy. You can answer if you understand the question.

A. I don't necessarily know if it's a CDCR policy. But per the procedures in the ISU office, that was a normal thing.

Q. Now the same day that you take the photographs and that you transfer them to the squad share, is that the same day that you also transfer photographs to discs?

A. Yeah, I logged it into evidence before I

left. So, yes.
Q. Describe to me what you did to -- when you say you logged it into evidence.
A. After I logged it into the squad share folder you just burn the photos onto the disc, label the disc as you would any other piece of evidence, you put the item number, which would be JF01, you label it with the incident, the date, and which locker it's going into. And once that's done then you have it inside an evidence envelope with chain of custody, what it is, evidence item, and you just log it into the evidence and you secure it in a locker.
Q. How many discs did the crime scene photos take up?
A. One.
Q. And so you just logged one disc?
A. Correct.
Q. Did you ever give any of your supervisors a copy of the disc?
A. Not that I can recall.
Q. Did you ever give Love a copy of the disc?
A. If I did it wouldn't have been out of the ordinary. But I can't recall just offhand. The ISU lieutenant requested photos quite often.
Q. Do you recall anything else of what you did

the disc, if there's anything else that you did in that process?

A. No, sir.

Q. Okay. And then what about after it's to the disc, what do you do with the disc? And then tell me what you do with the camera itself.

MR. ANDRADA: Objection. Compound. Calls for a narrative.

MS. GUPTA: Join.

A. Like, are you asking, like, is there a specific spot that the camera stays in the ISU office?

Q. Let's take it one by one.

First of all, what do you do with the disc?

A. The disc is secured inside the main evidence room.

Q. What do you do with the key?

A. It's in the main evidence locker in the back of the evidence locker on a key -- an assigned key set.

Q. And do you do -- you also drop off the camera that took the photographs?

A. No. The camera stays inside the ISU office.

Q. Are the photos that you took on your camera that day, do they remain on the camera?

Were you in the ISU office?
A. Yes.
Q. And you had your personal iPhone on you?
A. Yes.
Q. Okay. And so you're in the ISU office, you're on duty, you have your personal iPhone, and you access the Romero crime scene images on the squad share from a CDCR computer?
A. Yes.
Q. Are you by yourself when you do this?
A. Yes.
Q. You're not looking at these crime scene photos with anyone else?
A. No.
Q. And then it's at that point that you -- that you -- that you -- you take a photograph from your personal iPhone?
A. Yes.
Q. And how many photos would you estimate that you took?
A. Estimate three.
Q. And so when you say you did this much later, what would you estimate? A week? A month? A year?
A. A few weeks.
Q. A few weeks.

Were you still working in ISU?
A. If I wasn't in ISU I wouldn't have had access to them.
Q. All right. Excellent.
And so the -- and so you're positive then it was not the day of the incident that you took the photos from your personal iPhone, correct?
MS. GUPTA: Asked and answered. You can answer again.
A. Correct.
Q. And you're sure it's not just the following workweek?
MS. GUPTA: Asked and answered. You can answer again.
A. Correct.
Q. Okay. And would you estimate like three weeks? Four weeks? How many weeks would you estimate?
MS. GUPTA: Asked and answered. You can answer again.
MR. ANDRADA: Join.
A. I estimated about three weeks.
Q. And you photographed the crime scene images as they were displayed on your work station computer monitor, correct?

A. Correct.
Q. And you pulled them up from the squad share ISU shared folder?
A. Yes.
Q. Okay. And did you bring your personal iPhone into CSP Corcoran that day in order to take the photos?
MS. GUPTA: Assumes facts. You can answer.
A. No, not specifically. I didn't bring my phone in specifically for that, no.
Q. Okay. But your phone was obviously with you because you were in -- because you used it to take photos from the -- from -- of the crime scene images, right?
MS. GUPTA: Argumentative. You can answer.
A. Agreed. But that wasn't the reason I brought it in.
Q. Okay. But this is not the first time that you brought your personal iPhone into the CSP Corcoran institution?
MS. GUPTA: Assumes facts. Lacks foundation. You can answer.
A. What other times did I bring my phone in?

you took three photographs. Does that mean you took -- you clicked like your camera like three times and it took three separate images; is that what you're saying?

MR. ANDRADA: Objection. Compound.

MS. GUPTA: Join.

A. Yes. That's what I'm saying.

Q. It wasn't just one image, there was kind of -- I guess you'd say overview photographs?

MS. GUPTA: Objection. Misstates facts.

MR. ANDRADA: Objection. Also, vague and ambiguous as to overview facts.

MS. GUPTA: Assumes facts. Lacks foundation. Join.

Q. You can answer.

A. I believe it was a zoomed-out photo of the crime scene.

Q. Fair to say that you've described it as you took, quote, three overview photographs; would you agree with that?

MS. GUPTA: Objection. Assumes facts.

A. It was the same photo, I believe a different zoomed area. But, yes, three photos.

Q. Was it just -- I get that you're saying you took three different photos -- of the image that you

took, was it more than one crime scene image?
A. No, it was the same, it was just different zoomed areas, zoomed variations. It was like an overall, then a medium zoom and then a close-up.
Q. So it's one photograph that you took but then you kind of zoomed in further and further and took three different photographs of a different --
A. That's the protocol for processing a crime scene. When you're taking photos you got to get an overall view of it, a medium and then a zoomed-up view.
Q. Right. But aren't those of course three different frames?
A. Yes.
Q. So you took photos of three different frames?
A. You're saying on my cellphone there's three different frames on it, is that what you're asking if I took photos of?
Q. Yes. That's my question.
A. Yes. It's three different frames. However, it's the same -- it's the same picture, just zoomed in closer and closer.
Q. I get that it's the same picture. But I'm getting confused when you say it's zoomed in. If you did zoom in on it, there's three different frames and

Q. What about just for CDCR generally? For any job that you were doing for CDCR, was there any purpose in taking a photograph on your personal phone?

A. No.

Q. And why did you take photographs on your personal phone?

A. I don't think it was -- just because it was just such a -- as I describe it, just a horrific scene. It almost seemed fake. I don't know. I don't know. Maybe just process it later because you're so focused on getting the job done while you're there because there's so much going on. I guess I didn't actually have time to process what I was seeing. So maybe just by looking at it later if I figured out how to process it better.

Q. Did you also photograph on your personal phone to brag to your lady at home?

MS. GUPTA: Objection. Assumes facts. You can answer.

MR. ANDRADA: Join.

A. I told her about it. Yes.

Q. And you showed her it, right?

MS. GUPTA: Assumes facts.

A. I didn't.

Q. You didn't? Oh, okay.

So it's your testimony now today that you did not show --
A. It was -- it was my intention to but I didn't.
Q. Okay. Okay. We'll get back to this.
And so you -- you take the photo, is it still -- was it a couple weeks later? It was still March of 2019, correct, when you took the photos on your personal iPhone?
A. March 19th is the day of the incident, correct.
Q. No, the day of the incident is March 19th, then you said weeks later you take it. So what I'm saying is was it still March of 2019 when you took the photographs on your personal phone?
A. Oh, yeah, sure. I'm -- it was around the end of March around there.
Q. When I'm saying personal iPhone, do you remember like what model iPhone you had?
A. I -- no.
Q. Do you still have that phone?
A. I don't.
Q. But it was an iPhone?
A. Yes.
Q. And it belonged to you?

A. I attempted to show my lady the photo to attempt to process everything I had seen to talk about it. And she didn't want to see it. So I attempted to show her. She did not look at it.

Q. But that's not what you told Daniel Saucedo, is it?

MS. GUPTA: Argumentative.

MR. ANDRADA: Join.

MS. GUPTA: You can answer.

A. No. I should have made the -- I should have been more specific.

Q. And you -- okay. Well, actually, one second, I'll also show you your interview here. Just this -- still on Exhibit 9. This is now at minute 20:10.

MS. GUPTA: What was the time for the first one?

MR. DARLING: It's on the record.

27:10. It's 27:10.

MS. GUPTA: The first -- the first recording you played was at timestamp 27:10?

MR. DARLING: Yes.

MS. GUPTA: Okay. Thank you.

This one is at --

MR. DARLING: 20:10.

BY MR. DARLING:

Q. Have a listen.
(Exhibit 9 played)
Q. You hear that?
A. Yep. I -- yeah, I heard it.
Q. So you kept it -- you kept photos of the Romero crime scene on your phone for the purpose of showing your lady, right?
MS. GUPTA: Objection. Misstates prior testimony. You can answer.
A. I kept them on my phone to talk about it to show her to try and get some kind of understanding of what I had been through for that day.
Q. But --
A. I -- I don't know how else to answer it. It was -- it was, like I said, a horrific scene. It was a lot to take in. That was just something I did to try and process everything, I guess.
Q. And so your testimony today is that you tried to show her and she didn't want to see?
MS. GUPTA: Asked and answered. You can answer again.
MR. ANDRADA: Join.
A. Yes.
Q. And when was that?
A. I -- I couldn't tell you a specific date. I

A. Are you talking about the time I showed my lady or tried to show my lady the photo? Or are you talking the time I showed Officer Marshall? Because those are the only two occasions.

Q. So your testimony today is there's been only two occasions?

A. Yes.

Q. No other?

MS. GUPTA: Asked and answered. You can answer.

A. No.

Q. Okay. So some time in March or April in 2019 when you tried to show your lady you -- you show her your phone with the crime scene photos on it, correct?

A. Correct.

Q. And she looks away because she -- it's too graphic; is that fair to say?

MS. GUPTA: Objection. Calls for speculation. Lacks foundation. You can answer if you know why she -- whether she -- and assumes facts that she actually looked at it.

You can answer.

A. She looked away before I could even raise the phone up to show her. Just from me describing what it was she didn't want to see it.

Q. Okay. So you were already describing it and then you motioned to show her?

A. Yes.

Q. Okay. And you never tried to show her after that?

MS. GUPTA: Asked and answered multiple times. You can answer again.

A. No.

Q. Okay. And so then -- so then we're in -- so [redacted] keep it on your phone, right?

A. Correct.

Q. You don't delete them, right?

MR. ANDRADA: Asked and answered.

MS. GUPTA: Join.

A. Correct.

Q. What was the purpose for keeping them on your phone after that?

MS. GUPTA: Assumes facts with respect to the purpose. You can answer.

A. There was no purpose. I just didn't erase them.

Q. But were you worried that since you knew at

(Exhibit 10 played)

Q. You hear that, Mr. Fugate?

A. Uh-huh. Uh-huh. I did.

Q. All right. And do you remember this conversation that you had back in 2024?

A. I do.

Q. Okay. And you see this video. Who do you see present?

A. I -- I don't recall the officer on the left. I -- he was just there for the day. But I know [redacted], he's the one on the right.

Q. And then is that a computer on the right-hand side?

A. Yes.

Q. And --

MS. GUPTA: Vague as to --

Q. Do you see what's on the screen of that computer?

A. I do.

Q. And what is it?

A. It is the background to the YouTube video.

Q. What's that YouTube video?

A. Reggae music.

Q. And what does it say?

A. Smoke and Chill.

Q. And then do you recall what's underneath it?
MS. GUPTA: Calls for speculation. You can answer.
A. No.
Q. Is it 420?
A. It might be. I don't know.
MS. GUPTA: Calls for speculation.
Q. Are you allowed to listen to music on YouTube while on duty?
A. Not on the computer.
Q. Okay. All right.
So you heard your testimony. And please listen further. It's at 11:21:54 at CDCRSDT969, Exhibit 10.
(Exhibit 10 played)
Q. So you're talking about the homicide of Romero allegedly committed by Osuna, correct?
A. Correct.
Q. And you're bringing up that Osuna ate a body part of Romero?
A. Yes.
Q. And you're mentioning something about having -- having -- did you witness this? What exactly do you recall sharing here?
A. He was pretty much bragging about it to

everyone.

Q. Okay. Then you're telling that story to these two correctional officers, one whose last name is [redacted]?

A. Correct.

Q. And the other -- is it -- do you recall if his last name is [redacted]?

A. Yeah, I believe so.

Q. And then in telling this story the lights get turned off just right here, correct?

A. Correct.

Q. Why?

MS. GUPTA: Calls for speculation. Lacks foundation. You can answer.

MR. ANDRADA: Join.

MS. GUPTA: You can answer if you know.

A. We turned the lights off so you can't see into the office.

Q. And why don't you want anyone to see inside the office?

MS. GUPTA: Calls for speculation. Lacks foundation.

A. There are inmates. I didn't want inmates to know what I had on my phone.

Q. So you're also -- so you're bringing out your

phone to show [redacted] and [redacted] something?
A. Yes.
Q. And so does turning off the lights make it easier to show what you have on your phone?
MS. GUPTA: Same objections.
A. It doesn't make it any easier to see what's on the phone. It just prevents the inmates from seeing in the office.
Q. You want to make sure that the inmates can't see in your office because you're showing something that's on your phone?
A. I didn't want the inmates to see I had my phone period.
Q. So you knew that having your phone on you when you're on duty wasn't allowed?
MS. GUPTA: Asked and answered. You can answer.
A. Again, yes.
Q. And you knew that the inmates knew that as well, so that's why you wanted to keep it from them?
MS. GUPTA: Calls for speculation as to what inmates knew. You can answer if you know.
A. I don't understand his question.
Q. Yeah. You knew that the inmates knew that it is not allowed for a correctional officer to have a

cellphone on them when they're on duty, right?

MS. GUPTA: Calls for speculation as to what the inmates know. You can answer if you know.

MR. ANDRADA: Join.

A. I mean, I assume inmates know that, yes.

Q. Okay. And so despite knowing that you're not allowed to do it you -- right here you still show -- you still pull out your phone and show something on your phone, right?

A. Right.

Q. And so you know it's not allowed but you still do it. Why?

A. It kind of goes back to me trying to talk to my lady about it I guess to try to get an understanding and trying to process everything. It's easier to talk to people that are in the same profession the same as you.

Q. So this is like a therapy session with your coworkers?

MR. ANDRADA: Objection. Argumentative.

MS. GUPTA: Argumentative. Agreed. And also unprofessional. You can answer.

MR. ANDRADA: Also harassing.

Q. You can answer.

A. I mean, you can say it's therapy. But when

you see something like that, you got to talk about it. The easiest way to talk about it is to talk to people that go through similar things.

Q. Sure.

[redacted]

MS. GUPTA: Sorry, objection on the basis of privacy. I'm allowing you to answer. But, Madame Court Reporter, as to that last question and the answer to this one, can you please mark it confidential?

MR. DARLING: No, no, no, no. I'm not asking for the -- no, this is not confidential. This is not -- I'm not asking for the contents of what you discussed if you ended up seeing it. [redacted]

The question is: If you even did it at all. So you've already testified just now that you

scene?

MS. GUPTA: Confidential. You can answer.

[redacted]

Q. And so you're saying you would want to -- you didn't want to open up to people you didn't know so you would have preferred to open up to other correctional officers?

MS. GUPTA: Argumentative.

MR. ANDRADA: Join.

MS. GUPTA: You can answer.

A. Again, we're all locked up there with the inmates. We go through the same things day in and day out for eight hours, sometimes 16 hours. If anyone can understand going through something like that, it's going to be your fellow partners in prison. So, yeah, talking to them over a therapist that you don't even know is better for me personally.

Q. Okay. So you're testifying right now or you're saying right now that the purpose of turning out the lights and showing some images on your phone after knowing you're not supposed to have these images on your phone, the purpose was for what? Can you please describe?

MS. GUPTA: Asked and answered. Harassing.

MR. ANDRADA: Join.

MS. GUPTA: Mr. Fugate, if you could please answer again, I think for the sixth or seventh time. But go ahead.

A. It's going to be the same answer. It's just trying to get ahold of everything that we went through that day to process it and understand everything that was there and that we dealt with.

Q. Play for you 11:22:07 forward of Exhibit 10.

(Exhibit 10 played)

Q. I want to move back here. I want to show -- Mr. Fugate, I want you to pay attention to what's on your phone here.

(Exhibit 10 played)

Q. So just now here at 11:22:41 you select one image, right?

MS. GUPTA: Did you say 11:22? You're reading the timestamp at the bottom?

Q. Sorry. We'll start from scratch. That's what I'll be doing. So start from scratch.

I stopped -- the Exhibit 10 video is stopped at 11:22:41. Just before it stopped having just seen this video, Mr. Fugate, you select one of the images from your phone, correct?

A. Correct.

isn't a gotcha. I'm just trying to orient you, Mr. Fugate. You asked me what's public. I'm just giving you examples of what's public, right? So news is something, it's on social media or podcasts. These are examples of something being out in the public.

A. Got you.

Q. Does that clarify?

MS. GUPTA: Just so you know, the question is still when did you become aware of the crime scene photos being made public.

MR. DARLING: Exactly. Thank you. Exactly.

A. I think it was like after the first week. Like everyone was getting word they were out in the public.

Q. How did you hear?

A. I mean, just talk around the prison. I mean, if you're wanting to be -- need me to be specific on who I heard it from, I don't know. I -- it's just I remember, you know, hearing about it.

Q. Okay. Do you have -- do you recall any conversations about -- about any images that were -- that had been out in the public?

A. No.

Q. So what was your understanding of what

images, if any, had -- had been -- had been shared in the public domain?

MS. GUPTA: Assumes facts. You can answer.

MR. ANDRADA: Join.

A. I mean, can you rephrase the question? Like, I'm not understanding what you're asking. I'm sorry.

Q. Yeah. You were saying that -- that, like, you estimated as close to a week after the murder that you were hearing that the -- that photos of the crime scene were out in the public domain; is that what you're saying?

A. Yes.

MS. GUPTA: Misstates testimony. The witness says within a week. But you can answer.

A. Yes, within a week.

Q. And so -- and you don't recall who you spoke to about that with, correct?

A. No, I don't.

Q. But did you ever see images in that time period, you know, that -- that essentially were out in the public domain showing the crime scene?

A. No, I didn't.

Q. Okay. When did you first hear that this -- the fact that there were photos out in the public

domain were a concern to CDCR?
A. I mean, all I heard was the photos were out there. That's all I heard.
Q. Did you -- but was it your understanding that the -- the photos weren't supposed to be, as you say, out there?
A. Yeah. I understood that, yeah.
[redacted]
Q. So would you say now in terms of the understanding of your conduct that you had like a legitimate purpose for keeping these images on your phone?
MS. GUPTA: Vague and ambiguous as to legitimate purpose. Calls for a legal conclusion. You can answer.
MR. ANDRADA: Argumentative as well.
MS. GUPTA: Thank you. Argumentative. Join. You can answer if you understand what he's asking.
A. It just goes back to -- I mean, if you want to say a purpose it just -- it goes back to me wanting to show my lady, talk to her about it. She wanted

nothing to do with it.

Next best thing was my partners at work. So, I mean, if you're wanting to say a purpose, I guess it's just to cope in -- I keep saying the word process but that's the first thing that comes to mind is to process everything that happened.

Q. Between you trying to show your lady the photo and her looking away and then March of 2024 when you show [redacted] and [redacted], did you ever look at the crime scene images on your phone by yourself?

A. No.

Q. Okay. So almost five years pass and you're just -- and you know it's on your phone and your purpose is to hold them for a specific time for you to process them with coworkers?

MS. GUPTA: Objection. Misstates testimony. Argumentative. Asked and answered. You can answer again.

MR. ANDRADA: I think it's also compound.

MS. GUPTA: Join.

A. Can you ask the question again? I'm sorry.

MS. GUPTA: Before you do that, we have been going for about an hour and 20 minutes, so whenever you get a good time to take a natural break.

MR. DARLING: We can wrap up soon.

CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of Washington, being empowered administer oaths and affirmations remotely pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was requested.

IN WITNESS THEREOF, I have this date subscribed my name.

DATED:August 17, 2026 JORI L. MOORE, CSR NO. 1993