# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORA SOLARES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH BURNES, in his individual, and DOES 1 to 15, in their individual capacities,<br><br>Defendants. | No. 1:21-cv-01349-LHR<br><br>CONFIDENTIAL - ATTORNEYS' EYES ONLY<br><br>Page/Line through Page/Line<br><br>115/9 - 118/8<br>119/12 - 121/3<br>122/11 - 124/7<br>137/9 - 141/14<br>145/4 - 170/13<br>171/22 - 189/17<br>196/11 - 201/18<br>203/2 - 207/15<br>209/16 - 213/6<br>215/21 - 240/14<br>242/2 - 259/20<br>262/13 - 273/20<br>274/16 - 275/4<br>277/5 - 289/23<br>293/19 - 295/5<br>295/14 - 298/7<br>304/11 - 305/4 |

VIDEOTAPED REMOTE DEPOSITION OF

LIEUTENANT ERIK BEAM

Pages 1 through 311

Tuesday, July 14th, 2026

9:46 a.m. - 5:11 p.m., PT

Remote via Zoom

Stenographically Reported By:
GIANA DI NELLA, RSR, RPR

Job No.: 2906639



EXHIBIT A

REMOTE APPEARANCES:

On behalf of DORA SOLARES, an individual

LAW OFFICES OF ERIN DARLING
3435 Wilshire Blvd.
Suite 2910
Los Angeles, CA 90010
(323) 736-2230

BY: ERIN DARLING, ESQ.
Erin@ErinDarlingLaw.com

On behalf of JOSEPH BURNES

State of California Department of Justice Office of the Attorney General
1300 I Street
Suite 125
Sacramento, CA 95814
(916) 210-6008

BY: JEREMY DUGGAN, ESQ.
Jeremy.Duggan@doj.ca.gov

David Kuchinsky, ESQ.
David.Kuchinsky@doj.ca.gov

On behalf of E. BEAM AND FUGATE

Andrada & Associates
1939 Harrison Street
Suite 612
Oakland, CA 94612
(510) 287-4160, FAX-(510) 287-4161

BY: J. RANDALL ANDRADA,, ESQ.
Randrada@andradalaw.com

On behalf of FUGATE

KJAR, MCKENNA & STOCKALPER, LLP
841 Apollo St.
Suite 100
El Segundo, CA 90245-4769
(424) 397-1504, FAX-(424) 367-0384

BY: Molshree Gupta, Esq.
Mgupta@kmslegal.com

were photographs of -- of a crime scene image, specifically, that showed an inmate who had been beheaded.
        You're familiar with these image -- images --
    A.  Yes.
    Q.  -- correct?
    A.  Yes, that's correct.
    Q.  And at this point, you know that the decapitated inmate, his name was Luis -- or his last name was Romero?
    A.  Yes, that's correct.
    Q.  Okay. And you received an image -- or -- or -- you received some crime scene images of Romero's decapitated body, correct?
    A.  Correct.
    Q.  Okay. So that's -- that's -- just so you know, topically, that's what we're talking about right now.
    A.  Okay.
    Q.  So first off, when did you first see the photographs of Romero's body?
    A.  When I received a text message.
    Q.  Okay. In what form?
        When you say, "received a text," was it just -- it was, like, an attachment to a text or -- or what form was it?

A. No. I received a text from -- at the time, a number in "559," just the images of the crime scene. And I want to -- I want to say there was three of them.

Q. Okay. And it was -- was the number that you received it from, was it saved in your contact list, or is it a number that you didn't recognize?

MR. ANDRADA: Objection. Compound. Go ahead.

THE WITNESS: It was a number -- it could have been previously saved in my phone, which I'm assuming, because they have my number. But I -- I broke my cell phone accidently with the closing of my trunk of my car onto it, so I lost a lot of contacts from Corcoran because I had a new phone. So I'm assuming it was in my phone at one time.

BY MR. DARLING:

Q. Okay. And what do you recall that the images showed?

A. The only one I remember offhand was the beheading.

Q. Okay. But there was more than one image?

A. Yes. There was one -- more than one image. I just don't remember how many.

Q. Okay. Was it more than one file, or was it one file with multiple images in it?

A. That's correct. Because they -- I know for a fact they have my number because I personally gave it to them, so I assumed.

(End of confidential portion of transcript.)

BY MR. DARLING:

Q. So you receive it.

And was -- do -- do you recall what month this was?

MR. ANDRADA: Asked and answered.

THE WITNESS: No, I do not.

BY MR. DARLING:

Q. Okay. So whenever you received it, do you recall -- what did you do with this image that you received?

A. I e-mailed it to my work -- work e-mail via my personal e-mail.

Q. So walk me through that. So you get it via text.

And then you do what?

A. I just sent it -- I don't have a computer or laptop at home. I have -- just have my cell phone, like most Americans. So I e-mailed it to my work e-mail via my personal e-mail.

Q. How did it get to your personal e-mail?

A. From my phone.

Q. How did it get from your phone to your work -- to

MR. ANDRADA: Well, I'm sorry. What was the last part?

MR. DARLING: Madam Reporter.

THE WITNESS: Can you repeat that again?

(The requested portion was read back by the court reporter.)

MR. ANDRADA: Okay. Go ahead. You can answer.

THE WITNESS: It was nothing new to me, so it wasn't, like, shocking or anything like that.

BY MR. DARLING:

Q. Okay. Why did you decide to send it from your phone to your Yahoo personal e-mail account?

A. To send it to work -- to my work account.

Q. Why not send it directly to your CDCR work account?

A. Well, doesn't it have to go through e-mail to e-mail?

Q. I'm asking.

A. I thought the only way I could get it to my work e-mail account was through my personal e-mail, my own account. If there's another way, I wasn't -- I have no knowledge of that.

Q. Okay. And why did you want to send the Romero crime scene images to your work e-mail?

A. For training for my staff, specifically.

Q. And what was the training purpose of having a photo of a decapitated body?

A. To -- I sent it to my e-mail at work so I could show my captain and -- well, at that time, I worked two days on Charlie facility, so I was under Captain on Charlie yard. And then I worked three days in central services as a watch commander, so I worked for the custody captain, which I don't remember who it was at this time -- another captain.

So I took it in to get permission from both of them to share with staff because, at that time, we had a lot of incidents and drug overdoses on first watch, so I wanted to make sure that the sergeants and the officers were doing their job and doing their checks.

Q. So you mentioned drug overdoses.

Can you explain the connection between drug overdoses and a decapitated body?

A. Because you don't know what's going to happen on first watch. And the GP yards don't have a pipe check; they have 30-minute security checks, and I want to make sure the cops are checking for batteries, for rapes, for overdoses, for attempted, you know, murders, anything that could happen on first watch. And if they're not doing their 30-minute checks, that leaves a wide-open

time for inmates to be unsupervised in their cell.

Q. Okay. And so, then -- please explain further, then, what you were hoping to accomplish by sending the decapitated images -- or the images of decapitated Romero to your work e-mail for training purposes? Like what --

MR. ANDRADA: I think --

MR. DARLING: -- was --

MR. ANDRADA: -- it's been asked and answered. It calls for --

MR. DARLING: I'm not done.

MR. ANDRADA: -- a narrative.

MR. DARLING: Please.

BY MR. DARLING:

Q. What were you intending to do as a training with the image -- images?

A. To show staff what the worst-case scenario of something that could happen if they don't do their job correctly.

Q. And how many times did you send the crime scene images from your Yahoo account to your work account?

A. Just once.

Q. And once you receive -- oh, yeah.

So -- so -- just so I'm clear, you don't -- you testified earlier that you don't have your -- work

sent the crime scene image attached from your Yahoo account to you CDCR account?
A. Yes, that's correct.
Q. And so -- so you can confirm that, then, this was sent to you -- you sent -- from your Yahoo account to your CDCR account on Tuesday, May 21st, 2019, at 4:09 a.m.?
A. Yes, that's correct.
Q. Okay. And it -- here, it says two attachments: IMG and the ATT.
Do you -- do you know why there's two attachments here?
A. Yeah. I correct myself.
I didn't have Verizon at the time; I had AT&T.
Q. Okay.
A. That's what it looks like. I don't know. Honestly, I don't know what the two attachments are, but -- I don't remember the year exactly, but I switched from AT&T to Verizon, so.
Q. Okay. So you -- you had --
A. But, yes, that is an e-mail I sent.
Q. Okay. So that is the e-mail you sent, and, then, at the time, you had AT&T, right?
A. I'm assuming so. I don't know for sure.
Q. Well, you said -- I was asking what this "ATT"

is.
A. Yeah. That's what I'm assuming is AT&T, but I'm not for sure, so I don't want to say.
Q. Okay. Well, if you had to estimate, based on these attachments and what this, here, says, "ATT314439.TXT," is -- would you say it's a possibility that it's -- that you had an AT&T cell phone account?
A. Yeah. I would say it's possible. Yes.
Q. Okay. And then the "IMG_0345.JPG" -- right now I'm not going to show you the image, but you -- you would -- you would remember that the image that you were forwarding along was the Romero crime scene image showing a decapitated body, correct?
A. Yes, of course.
(End of confidential portion of transcript.)
BY MR. DARLING:
Q. Yeah. Okay.
(David Kuchinsky exited the proceeding remotely at 1:29 p.m., PT.)
BY MR. DARLING:
Q. So that's Exhibit 7.
Okay. So -- so -- so that account that we were just looking at, that -117, that's Exhibit 7.
So it -- so if I understand correctly, May 21st is when you sent -- from your Yahoo account to your CDCR

(ATTORNEYS' EYES ONLY: Beginning of confidential portion of transcript.)

BY MR. DARLING:

Q. Okay. So -- and so you see that the front is from Erik Beam?

A. Yes.

Q. And the "to" is to'

A. Yeah. She's a -- yes.

Q. Okay. And this is at 4:09 a.m. on May 21st?

A. Correct.

Q. And it says, "Forward: Corcoran"?

A. Correct.

Q. And you -- you forwarded the Romero crime scene images to her, correct?

A. Correct.

Q. Why?

A. Because she's a nursing supervisor at CTC.

Q. Okay. And what is -- why were you thinking of why a nursing supervisor should see this?

A. Because she's part of my team for emergencies -- for emergency response. And if we have a serious incident, you know -- she's going to do training with her staff, basically, if we have an alarm, to speed up; don't go slowly.

Q. Okay. So you send -- so you send it from your

A. Yeah.
Q. And this is at -- May 21st at 6:57 a.m.?
A. Yes.
Q. Okay. So almost three hours had passed, and you, again, forward along the Romero crime scene image?
A. Yes.
Q. Why?
A. Those officers work for me, so it was training purposes. I must have worked second watch that day, because at 6:57, I was already in second watch. I don't have a FALSA to give you exactly where I worked.
Q. So -- but -- so you worked -- you worked first watch and second watch, then, on May 21st?
A. Yes. That was -- that's very common at Salinas Valley.
Q. So in first watch you send to , and, then, second watch, you send to
A. Yes.
Q. And are they sisters?
A. That I couldn't tell you.
Q. Okay. You -- you know them, right?
Like, you work with them?
A. Yeah. I know my officers, but I don't get into

e-mails I sent, but --
Q. But more than five?
A. -- I'd say ten.
Yeah. I'd say more than five. Yes.
Q. Is it fair to say that everyone you e-mailed, you at some point talked to, and it was your understanding that -- that each of them were using the Romero crime scene images for their own trainings?
MR. ANDRADA: Vague and ambiguous as to time. Compound. May call for speculation.
THE WITNESS: I would say, yes, with the exception of' I don't know what he was going to do.
BY MR. DARLING:
Q. Okay.
A. I -- I sent him -- without talking to him, and then we talked to -- somehow afterwards. I just don't remember when or what it was about.
But everybody that worked at Salinas, they had it for training. Now, if they completed it, I don't know. But I know the facility I worked on, we completed it.
Q. Okay.
MR. DARLING: I'm going to now show you Exhibit 18, which is CDCRSDT221. Just pointing you to -221 here.

But go ahead again.
THE WITNESS: Of a rookie staff saying something inappropriate. I know for a fact the warden chief, deputy warden, and associates -- or associate wardens and the captains aren't going to say anything inappropriate in an e-mail. I know that for a fact.
BY MR. DARLING:
Q. Is another risk that the image could be -- could be e-mailed and circulated?
A. To me, there's no risk of that. I know none of those guys would have done that. Nobody I sent it to would have done that.
Q. Okay.
MR. DARLING: Now, turning our attention to Exhibit 22, CDCRSDT196. I'm showing you an e-mail from [redacted], on June 18th, 2019, at 5:11 p.m., to [redacted]
(Exhibit No. 22 was marked for identification.)
BY MR. DARLING:
Q. And it's forwarded, the e-mail you had sent [redacted] that same date on June 18th, 2019.
Do you see that year at --
A. Yes, I see it.
Q. And this shows -- (inaudible.)

THE WITNESS: No. Because --
MR. DUGGAN: Joined.
(ATTORNEYS' EYES ONLY: Beginning of confidential portion of transcript.)
THE WITNESS: -- the images were combined together. They wouldn't be in an incident package the way it looked on the phone. It wouldn't be three separate images in one -- one image.
BY MR. DARLING:
Q. Okay. Fair enough. So taking one by one, because there's three images -- let's just go one by one.
The top image, when you look at that image by itself, is it clear to you -- maybe it's not, so you tell me -- that that is a crime scene investigation photo?
A. No. None of those photos -- crime scene investigation photos are put on one sheet of paper, and they're numbered individually. Those photos were cropped and put into one image. We -- we wouldn't have done that for an investigation, we wouldn't have done it for an incident package, and we wouldn't have sent it to the DA looking like that. Somebody altered those photos.
Q. Okay. I get -- I get how the combination -- and

What other scenario could it be, if you have clearly a decapitated body in a cell that you now -- you -- that you knew, you know, was Corcoran 4A?

MR. ANDRADA: Same objections.

MR. DUGGAN: Objection. Calls for speculation. Yes. I join. Calls for speculation.

MS. GUPTA: Joined as to this question. And Madam Court Reporter, joined in the last question as well. Incomplete hypothetical. Lacks foundation.

BY MR. DARLING:

Q. And to be clear, I'm asking -- hypothetical. I'm asking this photo, though, that we've been talking about, Exhibit 29.

You can answer.

MR. DUGGAN: Same objections.

MR. ANDRADA: Yeah. Joined.

You know what, the reporter -- read it back.

THE WITNESS: No. To me, they're not crime scene -- crime scene photos or evidence photos. Somebody altered them and sent them out.

BY MR. DARLING:

Q. Okay. So -- so if they're not crime scene photos and they've been altered, did that ever give you pause as wondering maybe this is not something I should share since it has --

A. No.
Q. Why not?
A. No. Because I received photos like that before on IG -- IGI bulletins, ISU bulletins, DEA bulletins, FBI bulletins, ATF bulletins, and even e-mails from the governor on cartel happenings, on terrorist organizations.
I used to get tons of e-mails when I was on 4B or working at Salinas Valley, and I kept up on all the intel that was coming through with OCS, SSU. A lot of information was -- was shared with people they trust to basically do your job as a law enforcement -- so I've seen photos like this before, and I didn't think anything of it, if that makes sense.
Q. Okay. On the -- the Exhibit 29 that we saw, the three images, the Romero crime scene images, this was shown to you in your interviews with correct?
A. Yes.
Q. And you were telling the truth to -- especially to when you were -- when you were answering his questions and --
A. Yes, to the best of my knowledge at that time.
Q. So then, focused on these images still, you have not been assigned any role in the investigation into

BY MR. DARLING:

Q. Do you stand by that they didn't share it?

A. They didn't share it with anybody that was damaging to the State or to the family. I know that -- I don't know that for a fact, but I stand by that because I believe every single one of them.

Q. So can you assure my client that -- that they -- the individuals you e-mailed didn't share it -- and that they, then, shared it, and it just kind of gets shared?

A. At Salinas, yeah, I stand by that. everybody I mentioned in those e-mails, I stand by every single one of them.

Q. And do you understand that it's not just the sharing or publishing online, but just the act of sharing for, you know, legitimate government purpose -- like, that itself is -- can violate a family's right to -- to the death images of their loved one?

MR. ANDRADA: Well, that's -- assumes facts not in evidence. Argumentative. Calls for a legal conclusion.

MS. GUPTA: Joined.

MR. DUGGAN: Joined.

MR. DARLING: You can answer.

THE WITNESS: <u>It was shared at Salinas, and we did training, and we saved countless lives</u>. I feel

bad for the family, and they have my sympathies. But we save countless lives and make that prison better at Salinas Valley.

Now, Corcoran, I don't know. I left there in 2016. That was ten years ago. I don't -- I can't talk for those guys.

But Salinas, I stand by my decision, and I know for a fact we saved dozens of lives just by simply doing our job.

BY MR. DARLING:

Q. All right. Please explain: How did you save lives?

MR. ANDRADA: I'm sorry.

BY MR. DARLING:

Q. Yeah. You said you saved lives. I just don't -- I'm just not following.

Can you explain?

MR. ANDRADA: Well, what would you like him to do? Explain?

MR. DARLING: I literally asked that. That's the question.

THE WITNESS: Counselors are --

MS. GUPTA: Objection.

THE WITNESS: -- supposed to do --

MS. GUPTA: Sorry. Objection.

CERTIFICATE OF REPORTER

STATE OF ILLINOIS )
COUNTY OF DU PAGE )

I, GIANA DI NELLA, RSR, RPR, certify that I was authorized to and did stenographically report the deposition of LIEUTENANT ERIK BEAM, remotely; that a review of the transcript was not requested; and that the transcript, pages 6 through 310 are a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED July 28th, 2026.

GIANA DI NELLA, RSR, RPR
Notary Public
COMMISSION NUMBER: 1029130
EXPIRATION: 4/03/2030