Justin E. Sterling, State Bar No. 249491
LAW OFFICES OF JUSTIN STERLING
Justin@SterlingDefense.com
15760 Ventura Blvd. Suite 700
Encino, CA 91436
Tel. (818) 995-9452/Fax. (818) 824-3533

Erin Darling, State Bar No. 259724
LAW OFFICES OF ERIN DARLING
Erin@ErinDarlingLaw.com
3435 Wilshire Blvd. Suite 2910
Los Angeles, CA 90010
Tel. (323) 736-2230

Attorneys for Plaintiff Dora Solares

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DORA SOLARES, an individual<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH BURNS, in his individual and official capacity, and DOES 1 TO 15,<br><br>Defendants. | Case No. 1:21-cv-01349-LHR<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT LIEUTENANT ERIK BEAM'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Judge: Hon. Lee H. Rosenthal** |

Plaintiff Dora Solares hereby opposes the Motion for Summary Judgment filed by Defendant Erik Beam. *See* ECF Dkt. No. 100, Motion for Summary Judgment. Plaintiff requests that the Court deny this motion.

Respectfully submitted,

Dated: November 20, 2026

LAW OFFICES OF ERIN DARLING

By: */s/Erin Darling*
Erin Darling,
Attorneys for Plaintiff Dora Solares

# TABLE OF CONTENTS

**Page**


MEMORANDUM OF POINTS & AUTHORITIES ........ 1

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

- A. Defendant Erik Beam Knew That Investigative Evidence Is Confidential and that CDCR E-Mail May Not Be Used to Circulate Offensive Material ........ 2
- B. Beam Obtains Images From an Open Homicide Investigation and He Moves Them to His Personal E-mail Account ........ 3
- C. Beam E-mails Romero Crime Scene Images ........ 4
  - 1. May 21, 2019 ........ 4
  - 2. May 24, 2019 ........ 5
  - 3. May 25, 2019 ........ 5
  - 4. June 18, 2019 ........ 6
- D. The Chief Deputy Warden Orders Beam to Stop; Beam Does Not Disclose His E-mails ........ 7
- E. Beam's Accounts Shift ........ 7
- F. CDCR Rejects the Training Justification and Sustains Against Beam ........ 8

III. LEGAL STANDARD ON SUMMARY JUDGMENT ........ 9

IV. PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM SURVIVES DEFENDANT'S MOTION ........ 10

- A. Defendant Beam Violated Romero's Constitutional Rights, Including the Right to Substantive Due Process (42 USC § 1983) ........ 10
  - 1. Defendant Beam Violated Plaintiff's Right to Privacy ........ 10
  - 2. A Reasonable Jury Could Find That Beam Acted Without Any Legitimate Governmental Purpose ........ 11
  - 3. Beam's Dissemination Was Not a Closed, Internal Use ........ 13
  - 4. Beam's Conduct Shocks the Conscience ........ 14
  - 5. Beam's Conduct Caused Plaintiff's Injury ........ 14
- B. Defendant Beam Is Not Entitled to Qualified Immunity ........ 15

V. NEGLIGENCE ........ 17

VI. INVASION OF PRIVACY ........ 18

VII. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Admiralty Fund v. Tabor*, 677 F.2d 1297 (9th Cir. 1982) ........ 9
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........ 10
*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ........ 16
*Bryant v. Cnty. of L.A.*, No. 20-cv-9582-JFW, 2020 WL 8024857 (C.D. Cal. Dec. 28, 2020) ........ 17
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........ 14
*Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162 (9th Cir. 2006) ........ 9
*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ........ 14
*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ........ 10
*Doe v. John F. Kennedy Univ.*, No. 13-cv-01137-DMR, 2013 WL 4565061 (N.D. Cal. Aug. 27, 2013) ........ 19
*Hope v. Pelzer*, 536 U.S. 730 (2002) ........ 16
*Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978) ........ 15
*Marsh v. Cnty. of San Diego*, 680 F.3d 1148 (9th Cir. 2012) ........ 10–17
*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ........ 10
*Nicholson v. City of Los Angeles*, 935 F.3d 685 (9th Cir. 2019) ........ 11
*Pauly v. Vaquez* [verify case name], 2016 WL 9443732 (D.N.M. Aug. 10, 2016) ........ 17
*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) ........ 14
*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ........ 10, 13
*Robinson v. York*, 566 F.3d 817 (9th Cir. 2009) ........ 15
*Rochin v. California*, 342 U.S. 165 (1952) ........ 10, 11
*Saucier v. Katz*, 533 U.S. 194 (2001) ........ 15
*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) ........ 9, 13
*Serrano v. Francis*, 345 F.3d 1071 (9th Cir. 2003) ........ 16
*Taylor v. Barkes*, 575 U.S. 822 (2015) ........ 16

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) .......... 9
*Tolan v. Cotton*, 572 U.S. 650 (2014) .......... 10
*Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir. 1975) .......... 19
*Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003) .......... 16
*Wilson v. Layne*, 526 U.S. 603 (1999) .......... 16

**California Cases**

*Burgess v. Superior Court*, 2 Cal. 4th 1064 (1992) .......... 18
*Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764 (2011) .......... 17
*Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856 (2010) .......... 2, 14, 17, 18, 19
*Christensen v. Superior Court*, 54 Cal. 3d 868 (1991) .......... 17
*Kinsey v. Macur*, 107 Cal. App. 3d 265 (1980) .......... 19
*Ortega v. Kmart Corp.*, 26 Cal. 4th 1200 (2001) .......... 18
*Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953 (1997) .......... 18
*Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200 (1998) .......... 18

**Constitutional Provisions**

U.S. Const. amend. XIV .......... 11, 16

**Federal Statutes**

42 U.S.C. § 1983 .......... 10

**California Statutes**

Cal. Civ. Code § 1714(a) .......... 17
Cal. Gov't Code § 820(a) .......... 17

**Rules**

Fed. R. Civ. P. 56 .......... 14

**Other Authorities**

Cal. Dep't of Corr. & Rehab., Department Operations Manual .......... 2, 3, 14, 18
    §§ 33030.3.3, 47110.6–47110.10, 47110.17 .......... 3
    ch. 4, art. 45 (Information Security Policy) .......... 3

# MEMORANDUM OF POINTS & AUTHORITIES

## I. INTRODUCTION

On the morning of March 9, 2019, Luis Romero's decapitated, mutilated corpse was found in Cell 46 at California State Prison (CSP) - Corcoran. Mr. Romero was murdered by his cellmate, Jaime Osuna. Mr. Romero's body was brutally mutilated. Weeks later, with the homicide investigation still open, Erik Beam, a lieutenant working at Salinas Valley State prison, received photographs of Mr. Romero's remains via text message on his personal iPhone. Lieutenant Beam can still not identify who sent him the photographs. Although a lieutenant, Beam did not notify his superiors that a crime scene investigation photograph was being impermissibly distributed. Instead, Beam replied, "Good looking out." He then routed the images through his personal Yahoo account, into his CDCR e-mail account. Over the next four weeks Beam proceeded to e-mail at least sixteen people, including a personal friend working at a different prison. Beam's e-mails contained no instruction, no context, and certainly no mention of trainings. The majority of these e-mails contained no words at all, just the gruesome images as attachments. A handful of the e-mails contained his mordant wit: "Work can always get worse." Multiple recipients forwarded the images they received from Beam onto their own personal e-mail accounts. CDR's forensic review ultimately identified 24 employees who had received them. The distribution stopped only when the Chief Deputy Warden asked where Beam had obtained the images and ordered him to not send it to anyone else. But that was too late. The e-mailed images found their way onto the internet, where Mr. Romero's mother, plaintiff Dora Solares stumbled across them. By that time, CDCR had not bothered to inform Ms. Solares how her son had been killed, and she did not know that her son had been beheaded. In the first photo she saw, the poor woman saw that  her son "didn't' have his head. And he was wearing a boxer, and everything was covered I blood." In the second photo, Ms. Solares saw her son's head on a "bed or a table" and "in the walls were some letters written in blood." Suffice to say, Ms. Solares's symptoms of grief and anxiety worsened after that.

Beam's motion rests on the argument that he shared the images for a legitimate purpose, namely for "training." (ECF Dkt. No. 100 at 7, 9-10) That premise is supported only by Beam's own say-so, and a jury would be entitled to reject it. CDCR rejected it. Its Rule 30(b)(6) designee testified that no one would have requested the images for training because they were not approved training material and the investigation was still ongoing. CDCR sustained a misconduct finding against Beam and reduced his pay. Beam himself conceded he should not have shared it. Not one of Beam's e-mails mentions training. Beam's accounts of who sent him the images, when he received them, and what he knew have shifted repeatedly. Whether Beam acted for a legitimate purpose or out of "pure morbidity and sensationalism," *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 874 (2010), is a question of motive and credibility reserved for the jury. Because Beam's qualified immunity, negligence, and privacy arguments all depend on that same disputed premise, the motion should be denied in its entirety.

## II. STATEMENT OF FACTS

### A. Defendant Erik Beam Knew That Investigative Evidence Is Confidential and that CDCR E-Mail May Not Be Used to Circulate Offensive Material

Defendant Erik Beam began his CDCR career in January 2006 as a correctional officer at CSP-Corcoran. (Plaintiff's Separate Statement, Plaintiff's Additional Material Facts and Supporting Evidence (hereinafter, "PMF") 1)) and promoted to a lieutenant At Salinas Valley State Prison (SVSP) in April 2018. (PMF 2) Beam's duties as a lieutenant at Salinas Valley included interacting with the Investigative Services Unit ("ISU") almost every day. (PMF 3) Beam understood that evidence turned over to ISU is secured in an evidence locker with a chain of custody, and that non-ISU staff have no further access to it. (PMF 4) ISU shared confidential e-mails with Beam "once or twice a week," and he understood those e-mails were not to be shared further. (PMF 5)

Beam confirmed familiarity with these Department Operations Manual ("DOM") provisions:

- **Section 33030.3.3 (Law Enforcement Code of Ethics):** Beam acknowledged the provision that "confidential information received in my official capacity shall remain undisclosed unless disclosure is necessary in the performance of my duty." (PMF 6)
- **Section 47110.6 (Unacceptable Use of E-mail):** Beam confirmed familiarity with the prohibition on e-mails containing offensive, discriminatory, sexual, pornographic, profane, or revolutionary content, including attachments. (PMF 7)
- **Section 47110.7 (Privacy and Confidentiality):** Beam confirmed awareness that CDCR e-mail is property of CDCR, not private, and subject to monitoring. (PMF 8)
- **Section 47110.8 (Confidential and Sensitive Information):** Beam confirmed awareness that certain CDCR information is confidential and protected. (PMF 9)
- **Section 47110.17 (Enforcement):** Beam confirmed awareness that failure to comply with e-mail policy could result in disciplinary action up to and including dismissal, and that legal action may also be taken. (PMF 10)

Prior to March 2019, Beam also received annual block training on e-mail policies on handling personal information (Section 47110.9) and unsolicited e-mail (Section 47110.10). (PMF 11) In 2018, Beam signed a Security Awareness Self-Certification and Confidentiality form agreeing to comply with CDCR's DOM Chapter 4, Article 45 (Information Security Policy), to protect confidential and sensitive information, and to use CDCR systems only for authorized purposes. (PMF 12) Beam also signed a Computing Technology Use Agreement and a SVSP Employee Responsibility/Ethics form acknowledging professional conduct standards both on and off duty. (PMF 13) His training record confirmed completion of the Information Practice Act training (PMF 14)

**B. Beam Obtains Images From an Open Homicide Investigation and He Moves Them to His Personal E-mail Account**

At his deposition, Beam testified that he first received approximately three images of Mr. Romero's decapitated body from an unknown 559-area-code number. (PMF 15) He responded, "Good looking out." (PMF 16) The images were not formal ISU photographs; Beam described them as a cell-phone screenshot in which someone had cropped and combined three images into one. (PMF 17) Because he did not have access to CDCR e-mail on his phone, Beam sent the images to his personal Yahoo account and then to his CDCR account; the metadata places that transfer at 4:09 a.m. on May 21, 2019. (PMF 19)

Beam testified that he assumed the text came from one of two former Corcoran colleagues he had seen at the Kings County courthouse that same day. (PMF 20) This was Lieutenant Anthony Randolph, who told Beam he was the incident commander on the Romero homicide. (PMF 21) Beam first identified the other as Velazquez; however, Beam later identified the source as an Officer Grimsley ("It was Grimsley for sure."). (PMF 22)

### C. Beam E-mails Romero Crime Scene Images

Beam e-mailed at least sixteen people the Romero crime scene images. (PMR 23)

#### 1. May 21, 2019

On May 21, 2019, Beam forwarded the Romero crime scene images from his CDCR work e-mail to multiple individuals, all at Salinas Valley State Prison, stating the purpose was training:

- **Michelle Beattie (Nursing Supervisor/SRN II):** Forwarded at 4:09 a.m. Beam described her as part of his emergency response team and stated the purpose was to train medical staff to respond quickly to serious incidents. (PMF 24)
- **Daisy Avalos and Cindey Avalos (Correctional Officer and Sergeant):** Forwarded at 6:57 a.m. Beam stated these officers worked for him and were to use the images for training. One was a sergeant and one was an officer. (PMF 25)
- **Wesley Fonseca (Lieutenant):** Forwarded at 9:44 a.m. Beam stated Fonseca called him and requested the photo for training on his own facility. Beam did not ask how Fonseca knew he had the photo. (PMF 26)
- **Jason Weber (Captain):** Forwarded at 12:42 p.m. with the message "Work can always get worse." Beam stated he had spoken to Weber beforehand to obtain permission to conduct training on his facility, and that Weber had cleared it with Chief Deputy Warden Atchley. (PMF 27)

Although Beam testified that the purpose for sending the graphic images was for training, the body of these May 21, 2019, emails make no mention of training, and no written explanation was included in the body of the e-mail. (PMF 28)) Indeed, the only message in any of the four emails was the gallows humor statement: "Work can always get worse." (PMF 29)

**2. May 24, 2019**

Beam must have liked that line, because he repeated it in the next two e-mails he sent when he distributed Romero crime scene images. (PMF 30) Overall, he sent the images to six individuals via six individuals e-mails, as follows:

- **Paul Estrada (Sergeant):** E-mailed at 8:35 a.m. with the message "Work can always get worse." No mention of training is mentioned in the body of the e-mail, but Beam stated Estrada worked for him and was sent to conduct training. (PMF 31)
- **Lawrence Obodozie (Sergeant, Facility D):** E-mailed at 8:36 a.m. with the message "Work can always get worse." No mention of training is mentioned in the body of the e-mail. Beam stated Obodozie was a five-day regular on second watch on Delta Facility and had either called or come over to request the images for training. (PMF 32)
- **Natalie Rocco (Sergeant):** E-mailed at 8:37 a.m. Beam described her as a relief sergeant who worked all over the prison. (PMF 33)
- **William Brodie (Captain, California Medical Facility):** E-mailed at approximately 8:38 a.m. Brodie was a former lieutenant at CSP-Corcoran who had supervised Beam. Beam described him as a friend. (PMF 34) Brodie replied, "Damn. That's nasty." Beam did not provide any training instruction in response. (PMF 35) Captain Brodie worked at California Medical Facility at the time and was a personal friend and former supervisor of Beam's at CSP-Corcoran. Beam acknowledged this was not sent for Salinas Valley training purposes but because they were friends. (PMF 36)
- **David Ambriz (Lieutenant, Facility D):** E-mailed at 8:39 a.m. Beam stated Ambriz was going to use the images for training on Delta Facility. (200:5-201:6) (PMF 37) No mention of training is mentioned in the body of the e-mail.
- **Ashley Lyons (Correctional Counselor I):** E-mailed at 9:52 a.m. Beam stated the purpose was to train counselors to properly screen inmates for housing classification, emphasizing that failure to do so could result in tragedies like the Romero homicide. He stated that when he spoke to Lyons, approximately three to four other CCs were present and also viewed the images. (PMF 38) No mention of training is mentioned in the body of the e-mail.

**3. May 25, 2019**

Beam distributed Romero crime scene images again on May 25, 2019:

- **Julian Aquino (Lieutenant):** E-mailed at 8:42 p.m. on May 25, 2019. Beam stated this was forwarded accidentally from the Ashley Lyons e-mail chain, but that he did discuss the images with Aquino for training purposes. (216:10-219:8) (PMF 39)

**4. June 18, 2019**

On June 18, 2019, Beam again e-mailed himself from his Yahoo account to his CDCR account. (PMF 40) He then forwarded the images to four senior administrators at SVP at 8:03 a.m. (PMF 41)

- **Paul Sullivan (Associate Warden)**
- **Richard Mojica (Associate Warden)**
- **Jeffrey Hughes (Associate Warden)**
- **Matthew Atchley (Chief Deputy Warden)**

Beam stated these individuals requested the images for a morning meeting and that they had not previously seen the photos themselves, though they had previously authorized the training. (PMF 42) Sullivan responded "Wow. Thank you" (PMF 43) and later forwarded the images from his CDCR account to his personal AOL account. (PMF 44) Mojica forwarded the images from his CDCR account to his personal SBCGlobal account. (PMF 45) Beam stated he had no knowledge of why either Sullivan or Mojica forwarded the images to their personal accounts. (PMF 46) Weber had also previously forwarded the images to Hughes on June 1, 2019, from a state-issued iPhone. Hughes responded "Ty" (thank you). (PMF 47)

None of these e-mails says a word about training; the only text in any of them is "Work can always get worse." (PMF 48) Beam denies that the line was a joke. (PMF 49) Captain Brodie (Beam's former supervisor at Corcoran, a personal friend (PMF 34) and an employee of a different institution) replied, "Damn. That's nasty." (PMF 35) Beam gave him no training instruction and acknowledged that he sent the images not for SVSP training but "just because we, you know — we used to work together." (PMF 36) And although Beam insisted that he never sends e-mails without first talking to the recipient, he conceded that he may have spoken to Estrada, Ambriz, and Lyons only after sending them the images. (PMF 50)

**D. The Chief Deputy Warden Orders Beam to Stop; Beam Does Not Disclose His E-mails**

On June 18, 2019, after receiving the images, Chief Deputy Warden Atchley replied to Beam: "Yikes. That's worse than I thought. Where did you get this pic?" (PMF 51) Beam responded: "The incident commander is a buddy of mine." (PMF 52) Yet at his deposition, Beam stated he was **not** certain Randolph sent the images and that he had only assumed it: "I don't know. I know somebody in that phone record did, and I wish I knew who. I honestly wish I knew who." (PMF 53)

On June 19, 2019, Atchley sent a follow-up e-mail stating: "Copy that. I responded to the e-mail. And since I don't know the status of any of that situation, or even if that was supposed to get out, don't send that to anyone else. It's a screenshot from a cell phone, and that gives me - leads me to believe this shouldn't be passed around. If you know any different, feel free to call me." (PMF 54) That same day, Beam responded: "10-4" (meaning he acknowledged the direct order). (PMF 55) Beam then deleted the images from both his CDCR and Yahoo e-mail accounts and his personal cell phone. (PMF 56) Beam admitted that when he responded "10-4," he did not disclose to Atchley that he had already sent the images to at least ten other people. (PMF 57) Beam also stated Atchley already knew he had sent it for training purposes. (PMF 58)

**E. Beam's Accounts Shift**

**Source.** Beam has attributed the images to at least five different people: (1) Lieutenant Randolph ("The incident commander is a buddy of mine.") or (2) Officer Velazquez; (3) Officer Grimsley ("It was Grimsley for sure."); (4) Officer Rubio (Rubio "was the one whom took then ultimately sent the crime scene photos to people."; (5) Officer Cervantez ("The only I'm sure sent it to me was Cervantez.") (PMF 59) At deposition, Beam first denied ever telling an investigator that Rubio was the source ("No, I don't") and recanted only when shown his own letter. (PMF 60) At his *Skelly* hearing, he said he did not know who sent the photo. (PMF 61) At his deposition, Beam testified: "I honestly wish I knew who." (PMF 62)

**Timing.** Beam told OIA in his February 10, 2020, interview that he received the images in March or April 2019; at deposition he returned to May 21, 2019, the day he e-mailed them. (PMF 63) The images entered CDCR's system at 4:09 a.m. on May 21, 2019. (CDCRSDT 366) This was before Beam could have encountered Randolph at the courthouse. (PMF 64) Beam likewise testified both that he was at home when he forwarded the images and that "I was at work at that time. I wasn't at home." (PMF 65)

**Knowledge.** Beam testified, "When I received them, I did not know of the incident," and that he did not know the images came from Corcoran. (PMF 66) Yet he also testified that Randolph had told him that day that he was the incident commander on the Romero homicide, and that Beam assumed at the time that the images came from Corcoran. (PMF 67) In a single exchange, he testified both that "[y]ou can tell it was law enforcement related" [redacted]

## F. CDCR Rejects the Training Justification and Sustains Against Beam

The Office of Internal Affairs (OIA) conducted an investigation regarding the allegation that Beam "inappropriately accessed and/or transmitted confidential information/evidence pertaining to the homicide of inmate Luis Romero." (PMF 71) The hiring authority sustained that allegation. (PMF 72)

The OIA conducted a forensic analysis of Beam's e-mails and found "a total of 29 e-mails that included the crime scene photo." (PMF 73) The OIA investigator "reviewed the 24 different CDCR state email addresses either sending or receiving the same cell phone screenshot depicting the crime scene photographs." (PMF 74)

[redacted]

[redacted] 82) The on-the-job training ("844") sheets memorialize what training have been conducted on a particular day. (PMF 83) Beam has no 44 sheets to support he conducted any such trainings. (PMF 84)

## III. LEGAL STANDARD ON SUMMARY JUDGMENT

"Summary judgment is only appropriate if, viewing the evidence in the light most favorable to the party opposing the motion, the court finds that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Taylor v. List*, 880 F. 2d 1040, 1044 (9th Cir. 1989). After drawing inferences most favorable to the non-moving party, summary judgment may be granted only if all reasonable inferences defeat the non-movant's claims. *See, e.g.*, *Admiralty Fund v. Tabor*, 677 F. 2d 1297, 1298 (9th Cir. 1982). When the opposing parties present conflicting accounts of what happened, there is a triable issue of material fact that presents credibility issues that should be determined by a jury. *See Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1172-73 (9th Cir. 2006). Evidence examined must include "any expert testimony proffered by the plaintiff," to determine whether the official's story is internally consistent and consistent with other known facts. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Where, as here, the moving party's showing rests on his own testimony, the nonmoving party may defeat summary judgment with circumstantial evidence and with evidence that impeaches the movant's credibility. "Credibility determination, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted). And the factfinder "is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (internal quotation omitted).

## IV. PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM SURVIVES DEFENDANT'S MOTION

### A. Defendant Beam Violated Romero's Constitutional Rights, Including the Right to Substantive Due Process (42 USC § 1983)

#### 1. Defendant Beam Violated Plaintiff's Right to Privacy.

Family members have privacy interests in images of their loved ones' demise. *Nat. Archives & Records Admin v. Favish*, 541 U.S. 157, 171 ("[W]e hold that FOIA recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images."). Drawing on *Favish*, the Ninth Circuit in *Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012) observed the "well-established cultural tradition acknowledging a family's control over the body and death images of the deceased" and held that for "precisely the same reasons, we conclude that this right is also protected by substantive due process." *Id.* at 1154. In *Marsh*, a district attorney photocopied sixteen autopsy photographs of Plaintiff's dead two-years-old son and then shared one of the autopsy photographs with members of the press; the photograph was never published. *Id.* at 1152. Relying on the Supreme Court's holding in *Rochin v. California*, 342 U.S. 165, 173 (1952), the Ninth Circuit in *Marsh* held that "*public display* of death images is the kind of conduct that is likely to cause the family profound grief and therefore 'shocks the

conscience' and 'offend[s] the community's sense of fair play and decency."' *Id.* at 1155 (quoting *Rochin*, 342 U.S. at 172-173).

Under the Fourteenth Amendment, an officer's conduct is unconstitutional when it "shocks the conscience." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692-93 (9th Cir. 2019). This standard is met where the conduct in question "offend[s] the community's sense of fair play and decency." *Rochin v. California*, 342 U.S. 165, 173 (1952). Applying this standard in *Marsh*, the Ninth Circuit held the Fourteenth Amendment "protects a parent's right to control the physical remains, memory and images of a deceased child against the unwarranted public exploitation by the government." *Marsh*, 680 F.3d at 1154. "[A] parent's right to control a deceased child's remains and death images flows form the well-established substantive due process right to family integrity. *Id.* "This intrusion into the grief of a mother over her dead son – without any legitimate governmental purpose – 'shocks the conscience' and therefore violates Marsh's substantive due process rights." *Id.* at 1155.

Beam does not dispute that Plaintiff hold the Fourteenth Amendment right to control the images of her son's memory. Instead, Beam argues that he acted for a legitimate law enforcement purpose. The facts described above contradict such assertions. Here, a jury could easily conclude that Defendant Beam's conduct shocked the conscience when he emailed graphic crime scenes to at least sixteen individuals on at least four days, and that he did so with no real training purposes.

### 2. A Reasonable Jury Could Find That Beam Acted Without Any Legitimate Governmental Purpose

A jury could find that Beam violated Marsh and transmitted gory crime scene images with no legitimate governmental purposes. Plaintiff offers the following affirmative evidence from which a reasonable jury could find that the training justification is a post hoc rationalization.

*First*, CDCR rejected Beam's justification. Its Rule 30(b)(6) designee testified that there was no truth to the claim that higher-ups requested the images for training, because

"[u]nless it's approved training material, they wouldn't be asking for it." (PMF 85) The Romero crime scene images were not approved for any training because the "investigation was still ongoing." (PMF 71) CDCR found that Beam was not even authorized to possess the images, sustained the allegation that he improperly accessed and transmitted confidential evidence, and charged him with discourtesy to Mr. Romero and his family. (PMF 86) Beam's motion does not mention any of this.

*Second*, Beam's own words contradict his litigation position. [redacted] To Brodie, he sent the images "just because we . . . used to work together." (PMF 36) Brodie worked at a different institution, had no role in SVSP training, and responded only, "Damn. That's nasty." (PMF 35) That admission alone defeats the motion: Beam concedes at least one transmission made for a personal reason, and in *Marsh* a single unwarranted disclosure sufficed. 680 F.3d at 1152, 1155. It also refutes Beam's assertion that he shared the images only within SVSP. (ECF No. 100 at 7.)

*Third*, the documents are inconsistent with training. None of the e-mails mentions training; the only message is "Work can always get worse." (PMF 48) A jury could readily find that line to be gallows humor rather than pedagogy. The images were not vetted bulletins of the kind Beam claims to have received from IGI, ISU, or federal agencies, they were an altered cell-phone screenshot of evidence from an open homicide investigation, sent to Beam's personal phone from an unknown number. (PMF 15) Beam's account of the purpose of the training shifts: first-watch overdoses and security checks (ECF No. 100 at 5); a nursing supervisor to train medical emergency response (PMF 24); classification screening (PMF 38); for Brodie, friendship. In this self-justification, Beam treated a gruesome crime scene image of an open investigation the way Oprah Winfrey treats giving away cars: "You get an email! You get an email!" Beam even testified that he printed the images, passed them around, and shredded them before submitting his paperwork, leaving no documentary trace. (PMF 87) Any supporting records of these trainings either do not exist or have not been produced. (PMF 88)

*Fourth*, the claimed authorization is contradicted by the official who supposedly gave it. Beam testified that Atchley approved institution-wide training on May 21. (Plaintiff's Objections No. 8.) But when Atchley received the images four weeks later, he asked, "Where did you get this pic?"; wrote that he did not know "even if that was supposed to get out"; and ordered Beam not to send them "to anyone else." (PMF 54) Beam then acknowledged the order without disclosing that he had already sent the images to at least ten people. (*Id.*) A jury could infer that Beam concealed the scope of his distribution because he knew it was unauthorized.

*Fifth*, Beam's shifting accounts are themselves evidence. He has named at least five different sources for the images, denied writing a letter to OIA until confronted with it, given three different accounts of when he received the images, and testified both that he did and did not know of the homicide when he received them. A jury may treat that "dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves*, 530 U.S. at 147. Where the movant's account is uncorroborated and the record supplies reason to doubt it, summary judgment is inappropriate. *See Scott*, 39 F.3d at 915.[1]

**3. Beam's Dissemination Was Not a Closed, Internal Use**

Beam suggests that the absence of disclosure to the press distinguishes *Marsh*. (ECF No. 100 at 7.) But the photograph in *Marsh* was never published, and the Ninth Circuit did not limit the right to disclosures to the media. *Marsh*, 680 F.3d at 1152. The question is whether the government's exploitation of the images was "unwarranted." *Id.* at 1154. Here, Beam disseminated the images to sixteen people across multiple days, positions, and institutions; displayed them to groups of counselors and passed printouts around; and sent them to a friend at another prison.

Beam's claim that there was "no risk" the images would be circulated (ECF No. 100 at 5 (UF No. 12)) is refuted by the record. Sullivan and Mojica forwarded the images to personal accounts beyond CDCR's control, Weber forwarded them onward, and OIA

---

[1] Plaintiff disputes UF Nos. 6–14, each of which rests on Beam's own testimony. (*See* Pl.'s Resp. to Def.'s Statement of Undisputed Facts Nos. 6–14.)

ultimately identified 24 e-mail recipients. (PMF 74) Beam Dep. 225:7-233:17; DEF334.) *Catsouras* involved precisely such a pattern: the officers did not post the images themselves but e-mailed them to others, after which the images spread. 181 Cal. App. 4th at 863. Nor is Beam aided by the assertion that he lacked the "personal interest" of the *Marsh* prosecutor. (ECF No. 100 at 7.) Sharing death images with a friend, accompanied by a quip, is a personal purpose, and is precisely what this Court found actionable at the pleading stage. (ECF No. 26 at 12–13.)

**4. Beam's Conduct Shocks the Conscience**

Beam contends that only conduct "intended to injure" shocks the conscience. (ECF No. 100 at 6–7 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998)).) That overstates *Lewis*. The purpose-to-harm standard governs situations requiring split-second decision, but where "actual deliberation is practical," deliberate indifference suffices. *Lewis*, 523 U.S. at 851–53; *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Beam's conduct was not a split-second decision. He distributed the images over four weeks, on at least four separate days, in deliberate disregard of DOM rules on which he had been trained. Under that standard, *Marsh* itself treats the exploitation of a decedent's death images "without any legitimate governmental purpose" as conscience-shocking. *Marsh*, 680 F.3d at 1155. Even under the purpose-to-harm standard, conduct "unjustifiable by any government interest" suffices. *See Lewis*, 523 U.S. at 849. This is exactly what a jury could find here. According to Plaintiff's correctional practices expert Rick Winistorfer, "the fact that there was no content in the emails sent by Lt. Beam, not even a stated purpose for the email, leads one to believe that he was merely sending these photographs out for their shock value without any thought to an active investigation and their evidentiary status." (Winistorfer Report at 15)

**5. Beam's Conduct Caused Plaintiff's Injury**

Beam's causation argument is a single conclusory sentence. (ECF Dkt. No. 100 at 6) That is insufficient to carry his initial burden under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In any event, causation is not a close question. The constitutional

injury under *Marsh* is the government's unwarranted dissemination of the death images itself, 680 F.3d at 1155, and Beam admits that he personally made every transmission at issue. (Part II.C, *supra*.) Beam is also responsible for the onward spread of the images. A defendant causes a constitutional deprivation by "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978). Given his training and the absence of any limiting instruction in his e-mails, a jury could find that further circulation (such as the forwarding by Sullivan, Mojica, and Weber) was a foreseeable result of Beam's conduct. Plaintiff's expert Rick Winistorfer found, "It is further evident that Lt. Beam's gave no thought about what happens to his email once it is received by someone else and who, or how many people they may send it to." (Winistorfer Report at 15) Moreover, Dr. Gharibian's psychological expert report explicitly describes the causation, that when Plaintiff "saw the photos online, she started to feel anxious and was having nightmares." (PMF 91)

Before she saw the photos online, Ms. Solares did not know that her son had been beheaded. (PMF 92) In the first photo she saw, she saw that "he didn't' have his head. And he was wearing a boxer, and everything was covered I blood." (PMF 93) In the second photo she saw her son's head on a "bed or a table" and "in the walls were some letters written in blood." (PMF 94) Beam does not argue that the images Ms. Solares was forced to witness are not the images he emailed to at least sixteen people, but that somehow his emails were not the source of what was posted online for Mr. Solares to view. That is an issue for the jury.

**B. Defendant Beam Is Not Entitled to Qualified Immunity**

Qualified immunity presents two questions: "(1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The first question is answered above. As to the

second, Beam's motion offers no argument; it asserts only that there was no violation. (ECF No. 100 at 9–10.) Because Beam's immunity defense depends entirely on resolving the disputed question of his purpose in his favor, it cannot be decided on summary judgment. "Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003);

A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he [is] doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) That does not mean an official action is protected "unless the very action in question has previously been held unlawful'; it means only that "in the light of pre-existing law the unlawfulness must be apparent." *Id.* Prior authority need not present "identical or even 'materially similar' facts," it need only have provided defendants fair warning that their conduct was unlawful. *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2013); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002)("officials can still be on notice that their conduct violates established law even in novel factual circumstances.") The touchstone is whether "every reasonable official would have understood that what he is doing violates th[e] right." *Taylor v. Barkes*, 675 U.S. 822, 825 (2015). No "case directly on point" is required, though "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741.

The right at issue was clearly established by 2012, when the Ninth Circuit in *Marsh* held that the Fourteenth Amendment "protects a parent's right to control the physical remains, memory and images of a deceased child against the unwarranted public exploitation by the government." *Marsh*, 680 F.3d at 1154. Marsh gave notice to every government official from May 2012 forward. This Court has held so in this case. It concluded that the absence of clearly established case law identified in Marsh "was limited to instances prior to its decision," and that "when Defendants shared the photographs of

Mr. Romero's remains for personal purposes, they had 'fair warning' that their conduct was unlawful. (ECF No. 26, at 12-13 (citing *Pauly v. Vaquez*, 2016 WL 9443732, at *6 (D.N.M. Aug. 10, 2016) ("the right was not clearly established before May 29, 2012, the date *Marsh* was decided"). Beam acted in 2019.

## V. NEGLIGENCE

Under California law, "[e]veryone is responsible…for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." Cal. Civ. Code § 1714(a). That general duty applies to a public employee to the same extent as a private person. Cal. Gov't Code § 820(a). California law has long recognized a duty to handle dead bodies with due care because such conduct "is likely to cause serious emotional distress to members of the decedent's immediate family regardless of whether they observe the actual negligent conduct to the remains of their decedent." *See Christensen v. Superior Court,* 54 Cal.3dd 868, 894-95 (1991). California law also specifically imposes a duty on law enforcement officers to "refrain from exploiting gruesome death images by disseminating them to friends and family members or others with no involvement in official [law enforcement department] activities." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal.App.4th 856, 884 (2010). "*Catsouras* strongly supports the existence of a duty…with respect to the [officers] who took the photos of the victim and shared them with others." *Bryant v. Cnty. of L.A.*, Case No. 20-cv-9582-JFW, 2020 U.S. Dist. LEXIS 247113, at *16, 2020 WL 8024857, at *7 (C.D. Cal. Dec. 28, 2020).

The Court of Appeal in *Catsouras* found that the sharing of death images was "one of pure morbidity and sensationalism without legitimate public interest or law enforcement purpose." *Catsouras*, 181 Cal.App.4th at 874. The Court of Appeal held that the CHP and its officers owed plaintiffs a duty of care, even though the officers did not post images themselves. *Id.* at 884. The duty recognized in *Catsouras*, to not exploit a decedent's death images for purposes unrelated to official business, is defined by the category of conduct, not by a particular medium of transmission. *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 772

(2011) ("*Rowland* factors are evaluated at a relatively broad level of factual generality") Fugate's conduct falls within it.

Beam argues that harm to Mr. Romero's mother could not reasonably have been anticipated because he shared the images with "a limited audience for training purposes." (ECF No. 100 at 8.) That argument assumes the disputed fact. *Catsouras* recognized that harm to the family is the foreseeable consequence of disseminating death images. 181 Cal. App. 4th at 884. [redacted] tchley warned him the images "shouldn't be passed around." (Beam Dep. 238:20-239:2.)

Breach is a question of fact. A jury could find that Beam breached his duty when he moved evidence from an open homicide investigation onto CDCR's e-mail system in violation of the DOM provisions and certifications on which he had been trained; sent it to sixteen people, including a friend at another prison, with no limiting instruction; and passed printouts around. (Part II.A–D, *supra*.) [redacted] Causation is likewise for the jury. California applies the substantial-factor test, under which a defendant's conduct need not be the sole cause of the harm. *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968–69 (1997). *Ortega v. Kmart Corp.*, 26 Cal. 4th 1200, 1205–06 (2001), on which Beam relies, concerns speculation about whether the defendant's conduct occurred at all. Here, Beam admits every transmission. Where, as here, the defendant owes a duty directly to the plaintiff, damages for serious emotional distress are recoverable. *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072–73 (1992). The distress is enormous, as Plaintiff was forced to witness images of her son's beheaded corpse online, before she had even known how he died. (Solares Depo 100:15-17)

## VI. INVASION OF PRIVACY

Plaintiff's invasion-of-privacy claim requires: "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 214

(1998). California recognized that "family members have a common law privacy right in the death images of a decedent." *Catsouras*, 181 Cal. App. 4th at 897. "The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern." *Catsouras*, 181 Cal. App. 4th at 874 (quoting *Virgil v. Time, Inc.*, 527 F.2d 1122, 1129 (9th Cir. 1975)).

Public Disclosure: No California case has defined the number of people necessary to justify a finding of publicity. *Kinsey v. Macur*, 107 Cal. App. 3d 265, 271 (1989). "The claim is not so much one of total secrecy as it is the right to define one's circle of intimacy." *Id.* at 272 (citation omitted). Recalling details to a small "classroom of peers, who will presumably be [] colleagues in her professional field" can constitute a public disclosure. *See Doe v. John F. Kennedy Univ.*, Case No. 13-c-1137-DMR, 2013 WL 4565061, at *11, 2013 U.S. Dist. LEXIS 122050, at * 38 (N.D. Cal. Aug. 27, 2013) (alleged disclosure to six classmates and one professor stated a valid invasion of privacy claim). The jury could find that Beam was the source of the images that ultimately went online. *Catsouras* illustrates that point: defendants did not post to the internet, but were the source of the images that were e-mailed around and eventually "spread across the Internet like a malignant firestorm." *Catsouras*, 181 Cal. App. 4th at 863.

Private Fact: Beam does not dispute that the gory photos of Mr. Romero's mutilated remains are a private fact.

Offensiveness: *Catsouras* recognized that "a reasonable person would find defendants" disclosure of these [death] photographs to be offensive and objectionable." *Catsouras*, 181 Cal. App. 4th at 906. Beam does not dispute this.

No Legitimate Public Concern: as for the photos, Beam argues they were sent for a legitimate governmental interest. Whether this is even a believable claim is an issue for a jury.

## VII. CONCLUSION

For the foregoing reasons, Defendant Beam's summary judgment motion should be denied.

Respectfully submitted,

Dated: November 20, 2026 LAW OFFICES OF JUSTIN STERLING

By: *_/s/ Justin Sterling_*
Justin E. Sterling,
Attorneys for Plaintiff
Dora Solares

LAW OFFICES OF ERIN DARLING

By: *_/s/Erin Darling_*
Erin Darling,
Attorneys for Plaintiff
Dora Solares