Justin E. Sterling, State Bar No. 249491
LAW OFFICES OF JUSTIN STERLING
Justin@SterlingDefense.com
15760 Ventura Blvd. Suite 700
Encino, CA 91436
Tel. (818) 995-9452/Fax. (818) 824-3533

Erin Darling, State Bar No. 259724
LAW OFFICES OF ERIN DARLING
Erin@ErinDarlingLaw.com
3435 Wilshire Blvd. Suite 2910
Los Angeles, CA 90010
Tel. (323) 736-2230

Attorneys for Plaintiff Dora Solares

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DORA SOLARES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>RALPH DIAZ, in his individual capacity, KENNETH CLARK, in his individual capacity, JOSEPH BURNS, in his individual, and DOES 1 TO 15, in their individual capacities<br><br>Defendants. | Case No. 1:21-cv-01349-LHR<br><br>**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES AND OBJECTIONS IN OPPOSITION TO DEFENDANT LIEUTENANT ERIK BEAM'S MOTION FOR SUMMARY JUDGMENT**<br><br>(filed concurrently with Plaintiff's Opposition to Defendant Lieutenant Erik Beam's Motion for Summary Judgment) |

TO THE HONORABLE COURT, ALL PARTIES, AND TO THEIR ATTORNEYS OF RECORD:

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 260(b), Plaintiff Dora Solares hereby submits this Statement of Genuine Disputes and Objections in opposition to the Motion for Summary Judgment of Defendant Lieutenant Erik Beam (ECF No. 100). The left-hand column below reproduces, in order, the facts asserted in Lieutenant E. Beam's Statement of Undisputed Facts in Support of Motion for

Summary Judgment (ECF No. 100-1) and the evidence Defendant cites in support of each. Plaintiff's response to each asserted fact, together with Plaintiff's evidentiary objections and citations to the record establishing that genuine disputes of material fact preclude summary judgment, appears in the right-hand column.

# PLAINTIFF'S STATEMENT OF GENUINE DISPUTES AND OBJECTIONS IN OPPOSITION TO DEFENDANT BEAM'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| 1. Plaintiff alleges in her operative complaint that on the morning of March 9, 2019, Luis Romero, an inmate in the custody of CDCR, was found murdered inside his cell in the 4A1R housing unit at California State Prison, Corcoran.<br><br>Third Amended Complaint ("3AC"), ECF No. 71, ¶ 1. | Undisputed that the Third Amended Complaint so alleges. |
| 2. Plaintiff alleges Defendant Beam received crime scene photographs of Romero's body and shared these photographs with other CDCR staff at Salinas Valley State Prison.<br><br>3AC, ¶ 17. | Objection: Incomplete and misleading characterization of the record.<br><br>Undisputed that the Third Amended Complaint so alleges. Disputed to the extent the asserted fact implies that Beam's distribution of the images was confined to CDCR staff at Salinas Valley State Prison ("SVSP").<br><br>Beam e-mailed the Romero crime scene images to at least sixteen people on at least four separate days: May 21, May 24, May 25, and June 18, 2019. (Plaintiff's Exhibit 1, Beam Deposition ("Beam Depo.") 145:5-146:13, 147:25-149:21, 153:5-157:13, 171:24-172:17, 180:12-182:5, 186:14-187:10, 189:5-201:6, 205:2-212:18, 216:10-219:8, 221:8-222:20; Beam Depo. Exs. 8-20.)<br><br>Among the recipients was Captain William Brodie of the California Medical Facility, Beam's personal friend and former supervisor at CSP- |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | Corcoran, to whom Beam acknowledged he sent the images not for SVSP training purposes but "just because we . . . used to work together." (Beam Depo. 189:5-199:3; Beam Depo. Exs. 15-16.)<br><br>Recipients then forwarded the images beyond CDCR's control: Associate Warden Sullivan forwarded them to his personal AOL account; Associate Warden Mojica forwarded them to his personal SBCGlobal account; and Captain Weber forwarded them to Associate Warden Hughes from a state-issued iPhone. (Beam Depo. 225:7-233:17.)<br><br>CDCR's Office of Internal Affairs forensic review identified 29 e-mails containing the crime scene photograph and 24 different CDCR e-mail addresses sending or receiving it. (CDCR 319; DEF 334.) |
| 3. Beam received a text from a number in "559" area code with just the images of the crime scene. The images showed an inmate (Romero) who had been beheaded. Three separate images had been altered and combined into one image.<br><br>Deposition of Lt. Beam ("Beam Depo.") 109:12-110:3; 277:5-24; 279:18-20. | Objection: Incomplete; vague and ambiguous as to "just the images"; lacks foundation as to the identity of the sender, whom Beam cannot identify (Fed. R. Evid. 602).<br><br>Disputed in part.<br><br>Undisputed that Beam testified he received, by text message to his personal phone from an unidentified 559 number, an altered cell-phone screenshot combining three images of Mr. Romero's decapitated body. (Beam Depo. 109:21-110:3, 277:5-24; Beam Depo. Ex. 29, DEF 8616- |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | 8618.)<br><br>Disputed to the extent the asserted fact suggests that Beam received the images passively or without knowledge of their nature. Beam replied to the sender, "Good looking out." (Beam Depo. 113:6-9.) The images were not formal ISU photographs; they were evidence from an open homicide investigation that Beam was not authorized to possess. (Beam Depo. 277:5-24; Plaintiff's Exhibit 2, Rule 30(b)(6) Witness, Mendez ("Mendez Depo.") 19:12-22:8, 61:1-10.)<br><br>Beam's accounts of the source of the images have shifted repeatedly. He has attributed them to at least five different people: (1) Lieutenant Randolph ("The incident commander is a buddy of mine.") (Beam Depo. 237:24-238:14; Beam Depo. Ex. 26); (2) Officer Velazquez (Beam Depo. 119:19-121:3); (3) Officer Grimsley ("It was Grimsley for sure.") (Beam Depo. 262:18-263:11); (4) Officer Rubio, an attribution Beam denied at deposition until confronted with his own letter (CDCR 168; Beam Depo. Ex. 30; Beam Depo. 269:13-271:22); and (5) Officer Cervantez ("The only I'm sure sent it to me was Cervantez.") (Beam Depo. 270:4-5). [redacted] and he now testifies, "I honestly wish I knew who." (Beam Depo. |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | 267:22-24.)<br><br>Beam's accounts of when he received the images have likewise shifted. He told OIA in his February 10, 2020 interview that he received them in March or April 2019; at deposition he testified he received them on May 21, 2019. (Beam Depo. 242:2-16, 263:19-264:8.) The images entered CDCR's system at 4:09 a.m. on May 21, 2019, before Beam could have encountered Lieutenant Randolph at the Kings County courthouse that day. (CDCRSDT 366; Beam Depo. 119:19-121:3.)<br><br>Beam's accounts of what he knew are also inconsistent. He testified, "When I received them, I did not know of the incident" (Beam Depo. 112:6-18), yet also testified that Randolph told him that day that he was the incident commander on the Romero homicide and that Beam assumed the images came from Corcoran. (Beam Depo. 163:10-12, 253:14-254:13.) In a single exchange he testified both that "[y]ou can tell it was law enforcement related" and "No, I could not." (Beam Depo. 114:5-15.) |
| 4. Beam e-mailed the images to his work e-mail via his personal e-mail from his phone.<br><br>Beam Depo. 121:12-24. | Objection: Incomplete.<br><br>Undisputed that Beam routed the images from his personal phone through his personal Yahoo account into his CDCR e-mail account. (Beam Depo. 121:15-122:6, 139:5-140:8, 143:4-14; Beam Depo. Ex. 7, CDCRSDT 117.) |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | Plaintiff further states that, in doing so, Beam placed evidence from an open homicide investigation onto CDCR's e-mail system notwithstanding his acknowledged familiarity with Department Operations Manual ("DOM") § 33030.3.3 (confidential information received in an official capacity "shall remain undisclosed unless disclosure is necessary in the performance of my duty"), § 47110.6 (prohibiting e-mails containing offensive content, including attachments), § 47110.7 (CDCR e-mail is not private), § 47110.8 (confidential and sensitive information), and § 47110.17 (enforcement), and notwithstanding the Security Awareness Self-Certification and Confidentiality form he signed in 2018. (Beam Depo. 47:18-24, 49:12-50:9, 51:5-25, 54:5-18, 65:21-70:21; Beam Depo. Ex. 3.)<br><br>Beam has also testified inconsistently as to whether he was at home or at work when he transferred the images. (Beam Depo. 135:2-5, 143:11-14, 144:19-20.) |
| 5. Beam's email from his Yahoo account to his CDCR email account – on Tuesday May 21, 2019 at 4:09 a.m. -- contained an attachment ("IMG_0345.JPG") by which he forwarded the Romero crime scene image showing a decapitated body.<br><br>Beam Depo. 140:1-8; 141:9-14. | Undisputed.<br><br>Plaintiff further states that the 4:09 a.m. timestamp cannot be reconciled with Beam's account that he received the images after encountering Lieutenant Randolph at the Kings County courthouse that same day, or with his statement to OIA that he received them in March or April |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | 2019. (CDCRSDT 366; Beam Depo. 119:19-121:3, 242:2-16, 263:19-264:8.)<br><br>At 4:09 a.m. that same morning, Beam forwarded the image from his CDCR account to Nursing Supervisor Michelle Beattie, with no written explanation in the body of the e-mail. (Beam Depo. 145:5-146:13, 147:21-150:14; Beam Depo. Ex. 8.) |
| 6. Beam sent the Romero crime scene images to his work e-mail specifically for training his staff.<br><br>Beam Depo. 127:24-128:1. | Objection: Lacks foundation; vague and ambiguous as to "training" and "his staff."<br><br>Disputed. The asserted training purpose rests solely on Beam's own uncorroborated testimony and is contradicted by the documentary record, by CDCR's findings, and by Beam's own prior admissions.<br><br>*No e-mail mentions training.* None of Beam's e-mails transmitting the images mentions training or contains any instruction; most contain no words at all, and the only text in any of them is "Work can always get worse." (Beam Depo. 147:21-150:14; Beam Depo. Exs. 8-18.)<br><br>*CDCR rejected the training justification.* CDCR's Rule 30(b)(6) designee testified that there was no truth to Beam's contention that higher-ups requested the images for training: "Unless it's approved training material, they wouldn't be asking for it." The images were not approved for sharing because the |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | [redacted] |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | sent the images to Captain Brodie of the California Medical Facility not for SVSP training purposes but because they were friends who "used to work together." (Beam Depo. 189:5-199:3; Beam Depo. Exs. 15-16.)<br><br>*No training records exist.* On-the-job training ("844") sheets memorialize the trainings conducted on a given day (Beam Depo. 176:14-20), and Beam has no 844 sheets reflecting any training using the images. Beam testified that he printed the images, passed them around, and shredded them, leaving no documentary trace, and the supporting records have not been produced. (Beam Depo. 288:20-289:22, 300:15-303:20.)<br><br>*Contacts post-dated transmission.* Although Beam claims he never sends e-mails without first speaking to the recipient, he conceded that he may have spoken to Estrada, Ambriz, and Lyons only after sending them the images. (Beam Depo. 174:10-15, 201:14-18, 210:16-19.)<br><br>*Expert testimony.* Plaintiff's correctional practices expert, Rick Winistorfer, opines that "the fact that there was no content in the emails sent by Lt. Beam, not even a stated purpose for the email, leads one to believe that he was merely sending these photographs out for their shock value without any thought to an active investigation |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | and their evidentiary status." (Winistorfer Report at 15.) |
| 7. Beam intended to use the crime scene images to show staff what the worst-case scenario of something that could happen if they don't do their jobs correctly.<br><br>Beam Depo. 129:15-19. | Objection: Lacks foundation; vague and ambiguous as to "staff."<br><br>Disputed. Plaintiff incorporates by reference her response to Fact No. 6.<br><br>Beam's stated purpose has shifted from recipient to recipient: first-watch overdoses and security checks (Beam Depo. 128:11-129:1); training medical staff to respond to serious incidents (Beattie) (Beam Depo. 145:5-146:13); training counselors to screen inmates for housing classification (Lyons) (Beam Depo. 205:2-212:18); and, as to Captain Brodie, friendship (Beam Depo. 189:5-199:3).<br><br>No recipient received any instruction concerning a "worst-case scenario." The only text in any of Beam's e-mails was "Work can always get worse" (Beam Depo. 147:21-150:14; Beam Depo. Exs. 8-18), a line Beam denies was a joke. (Beam Depo. 247:15-25.) When Captain Brodie replied, "Damn. That's nasty," Beam provided no training instruction in response. (Beam Depo. 189:9-197:24; Beam Depo. Ex. 16.)<br><br>Many recipients were not Beam's staff, including Captain Weber, Lieutenant Fonseca, Captain Brodie of another institution, three Associate Wardens, and the Chief Deputy Warden. (Beam Depo. |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | 153:5-157:13, 189:5-199:3, 221:8-222:20; Beam Depo. Exs. 10-11, 15, 20.) |
| 8. Beam sought permission from the two Captains for whom he worked to share the crime scene images with staff because, at that time, they had a lot of incidents and drug overdoses on first watch; he wanted to make sure that the sergeants and the officers were doing their job and doing their checks.<br><br>Beam Depo. 128:11-15. | Objection: Hearsay (Fed. R. Evid. 801(c), 802) to the extent offered to prove that the Captains, or Chief Deputy Warden Atchley through them, authorized distribution of the images; lacks foundation (Fed. R. Evid. 602) and vague as to "a lot of incidents and drug overdoses on first watch"; compound.<br><br>Disputed. Plaintiff incorporates by reference her response to Fact No. 6.<br><br>No document reflects any authorization. Beam testified that Captain Weber cleared training with Chief Deputy Warden Atchley and that Atchley approved institution-wide training on May 21, 2019. (Beam Depo. 153:5-155:25, 167:4-169:2, 178:22-179:4.) But when Atchley received the images four weeks later, on June 18, 2019, he responded, "Yikes. That's worse than I thought. Where did you get this pic?" (Beam Depo. Ex. 25.) The next day Atchley wrote that he did not know "even if that was supposed to get out," that the images "shouldn't be passed around," and directed Beam, "don't send that to anyone else." (Beam Depo. 238:20-239:2; Beam Depo. Ex. 26.)<br><br>Beam responded "10-4" without disclosing that he had already sent the images to at least ten other |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | people. (Beam Depo. 239:9-240:21, 256:11-23.)<br><br>CDCR's Rule 30(b)(6) designee testified that there was no truth to Beam's contention that higher-ups requested the images for training. (Mendez Depo. 60:5-61:10.)<br><br>Beam's distribution was not confined to first-watch sergeants and officers. He sent the images to a nursing supervisor (Beam Depo. 145:5-146:13); to Sergeant Obodozie, a five-day regular on second watch (Beam Depo. 180:12-182:5; Beam Depo. Ex. 13); to correctional counselors (Beam Depo. 205:2-212:18); to Associate Wardens and the Chief Deputy Warden (Beam Depo. 221:8-222:20); and to a friend at another institution (Beam Depo. 189:5-199:3). |
| 9. To explain the connection between drug overdoses and a decapitated body, correctional officers don't know what's going to happen on first watch. And the General Population yards don't have a pipe check; they have 30-minute security checks, and Beam wanted to make sure the cops were checking for batteries, for rapes, for overdoses, for attempted murders, anything that could happen on first watch. And if they're not doing their 30-minute checks, that leaves a wide-open time for inmates to be unsupervised in their cell.<br><br>Beam Depo. 128:17-129:1. | Objection: Argumentative; constitutes argument rather than a statement of material fact; lacks foundation; irrelevant and unduly prejudicial (Fed. R. Evid. 401-403).<br><br>Disputed. Plaintiff incorporates by reference her responses to Fact Nos. 6 and 8.<br><br>None of Beam's e-mails referenced first watch, 30-minute security checks, overdoses, batteries, rapes, or attempted murders; the only text in any of them was "Work can always get worse." (Beam Depo. 147:21-150:14; Beam Depo. Exs. 8-18.) |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | Many recipients had no first-watch security-check responsibility, including Nursing Supervisor Beattie (Beam Depo. 145:5-146:13); Correctional Counselor Lyons and three or four other counselors who viewed the images with her (Beam Depo. 205:2-212:18); Sergeant Obodozie, a second-watch regular (Beam Depo. 180:12-182:5); the Associate Wardens and Chief Deputy Warden (Beam Depo. 221:8-222:20); and Captain Brodie, who worked at a different institution (Beam Depo. 189:5-199:3).<br><br>The image was an altered cell-phone screenshot of evidence from an open homicide investigation at a different institution, which CDCR had not approved for any training. (Beam Depo. 277:5-24; Mendez Depo. 60:5-61:10.)<br><br>Plaintiff's expert opines that the absence of any content or stated purpose in Beam's e-mails indicates that he was "merely sending these photographs out for their shock value." (Winistorfer Report at 15.) |
| 10. Beam forwarded the crime scene images to a member of his emergency response team so that she could train her staff in responding to a serious incident. Beam forwarded the crime scene images to officers who worked for him for training purposes.<br><br>Beam Depo. 145:13-24; 148:5-10. | Objection: Compound; incomplete.<br><br>Disputed. Plaintiff incorporates by reference her response to Fact No. 6.<br><br>Undisputed only that Beam forwarded the images to Nursing Supervisor Michelle Beattie and to Daisy Avalos and Cindey Avalos, an |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | officer and a sergeant. (Beam Depo. 145:5-146:13, 147:25-149:21; Beam Depo. Exs. 8-9.) Disputed that the transmissions were for training: the bodies of these e-mails make no mention of training and contain no written explanation. (Beam Depo. 147:21-150:14; Beam Depo. Exs. 8-9.)<br><br>Beam's distribution extended well beyond his emergency response team and subordinates, to Lieutenant Fonseca, Captain Weber, Captain Brodie of the California Medical Facility, Lieutenant Aquino (to whom Beam claims he sent the images "accidentally"), three Associate Wardens, and the Chief Deputy Warden. (Beam Depo. 153:5-157:13, 189:5-199:3, 216:10-219:8, 221:8-222:20; Beam Depo. Exs. 10-11, 15, 19-20.)<br><br>Beam conceded that he may have spoken to Estrada, Ambriz, and Lyons only after sending them the images. (Beam Depo. 174:10-15, 201:14-18, 210:16-19.) |
| 11. It was Beam's understanding that other SVSP staff were using the Romero crime scene images for their own trainings.<br><br>Beam Depo. 204:5-21. | Objection: Lacks personal knowledge (Fed. R. Evid. 602); calls for speculation; hearsay to the extent based on statements of others (Fed. R. Evid. 801(c), 802); irrelevant (Fed. R. Evid. 401-403).<br><br>Disputed. Plaintiff incorporates by reference her response to Fact No. 6.<br><br>CDCR's Rule 30(b)(6) designee |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | testified that staff would not request the images for training because they were not approved training material and the investigation was still ongoing. (Mendez Depo. 60:5-61:10.)<br><br>No training records reflect any use of the images. (Beam Depo. 176:14-20, 288:20-289:22, 300:15-303:20.)<br><br>Recipients' conduct is inconsistent with training use. Associate Warden Sullivan replied "Wow. Thank you" and forwarded the images to his personal AOL account; Associate Warden Mojica forwarded them to his personal SBCGlobal account; and Beam has no knowledge of why either did so. (Beam Depo. 225:7-231:22; Beam Depo. Ex. 21.) |
| 12. There was no risk that the crime scene images could be e-mailed and circulated because nobody that Beam sent it to would have done that.<br><br>Beam Depo. 228:8-12. | Objection: Calls for speculation; lacks foundation and personal knowledge (Fed. R. Evid. 602); improper lay opinion (Fed. R. Evid. 701).<br><br>Disputed.<br><br>The images were in fact further e-mailed and circulated by Beam's recipients. Associate Warden Sullivan forwarded them to his personal AOL account; Associate Warden Mojica forwarded them to his personal SBCGlobal account; and Captain Weber forwarded them to Associate Warden Hughes from a state-issued iPhone on June 1, 2019. (Beam Depo. 225:7-233:17.) OIA's forensic review identified 29 e-mails |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | and 24 different CDCR e-mail addresses sending or receiving the image. (CDCR 319; DEF 334.)<br><br>Chief Deputy Warden Atchley warned Beam that the images "shouldn't be passed around." (Beam Depo. 238:20-239:2; Beam Depo. Ex. 26.) Beam's e-mails contained no limiting instruction. (Beam Depo. 147:21-150:14; Beam Depo. Exs. 8-18.)<br><br>Beam also displayed the images to three or four correctional counselors who were not recipients of his e-mails, and printed the images and passed them around. (Beam Depo. 205:2-212:18, 288:20-289:22.)<br><br>Plaintiff's expert opines that "Lt. Beam's gave no thought about what happens to his email once it is received by someone else and who, or how many people they may send it to." (Winistorfer Report at 15.)<br><br>Plaintiff later viewed images of her son's decapitated remains online, before she knew that he had been beheaded. (Solares Depo. 100:15-17, 102:5-15; Gharibian Report at 3.) |
| 13. Beam had received similar photos before in IGI bulletins, ISU bulletins, DEA bulletins, FBI bulletins, ATF bulletins, and even e-mails from the governor on cartel happenings, on terrorist organizations.<br><br>Beam Depo. 280:3-14. | Objection: Irrelevant (Fed. R. Evid. 401-403); vague and ambiguous as to "similar photos"; lacks foundation; hearsay and best evidence rule (Fed. R. Evid. 802, 1002) to the extent offered to prove the contents of the referenced bulletins and e-mails.<br><br>Disputed. |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | The Romero images were not vetted official bulletins. They were an altered cell-phone screenshot sent to Beam's personal phone from an unidentified number, depicting evidence from an open homicide investigation that Beam was not authorized to possess. (Beam Depo. 109:21-110:3, 277:5-24; Mendez Depo. 19:12-22:8, 61:1-10.)<br><br>Beam understood that evidence turned over to ISU is secured in an evidence locker with a chain of custody, that non-ISU staff have no further access to it, and that confidential ISU e-mails he received were not to be shared further. (Beam Depo. 38:6-13, 41:7-43:3.) DOM § 33030.3.3 required that confidential information received in his official capacity remain undisclosed unless disclosure was necessary in the performance of his duty. (Beam Depo. 47:18-24.)<br><br>CDCR sustained misconduct findings against Beam for accessing and transmitting the images. (DEF 331; Mendez Depo. 19:12-22:8, 28:6-29:3.) |
| 14. The images were shared at Salinas Valley State Prison, where the officers did training and saved countless lives which made the prison better.<br><br>Beam Depo. 284:24-285:3. | Objection: Calls for speculation; lacks foundation and personal knowledge (Fed. R. Evid. 602); improper lay opinion (Fed. R. Evid. 701); argumentative; vague and ambiguous as to "countless lives"; irrelevant (Fed. R. Evid. 401-403).<br><br>Disputed. Plaintiff incorporates by |

| DEFENDANT'S ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | reference her response to Fact No. 6.<br><br>There is no evidence that any training using the images occurred or that any life was saved. Beam has no 844 on-the-job training sheets reflecting any such training, and the supporting records have not been produced. (Beam Depo. 176:14-20, 288:20-289:22, 300:15-303:20.)<br><br>The images were not shared only at SVSP. Beam sent them to Captain Brodie at the California Medical Facility, and recipients forwarded them to personal e-mail accounts outside CDCR. (Beam Depo. 189:5-199:3, 225:7-231:22; Beam Depo. Exs. 15-16.)<br><br>CDCR rejected Beam's training [redacted] |

# PLAINTIFF'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE ("PMF")

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| **A. Defendant Erik Beam Knew That Investigative Evidence Is Confidential and That CDCR E-Mail May Not Be Used to Circulate Offensive Material** | | |
| 1. | Defendant Erik Beam began his CDCR career in January 2006 as a correctional officer at California State Prison ("CSP")-Corcoran. | 1. Plaintiff's Exhibit 1, Beam Depo. 15:17-24. ("Beam Depo") |
| 2. | Beam was promoted to lieutenant at Salinas Valley State Prison ("SVSP") in April 2018. | 2. Beam Depo. 30:13-21. |
| 3. | Beam's duties as a lieutenant at SVSP included interacting with the Investigative Services Unit ("ISU") almost every day. | 3. Beam Depo. 35:22-36:6. |
| 4. | Beam understood that evidence turned over to ISU is secured in an evidence locker with a chain of custody, and that non-ISU staff have no further access to it. | 4. Beam Depo. 41:7-43:3. |
| 5. | ISU shared confidential e-mails with Beam "once or twice a week," and he understood those e-mails were not to be shared further. | 5. Beam Depo. 38:6-13. |
| 6. | Beam acknowledged Department Operations Manual ("DOM") Section 33030.3.3 (Law Enforcement Code of Ethics), which provides that "confidential information received in my official capacity shall remain undisclosed unless disclosure is necessary in the performance of my duty." | 6. Beam Depo. 47:18-24. |
| 7. | Beam confirmed familiarity with DOM Section 47110.6 (Unacceptable Use of E-mail), which prohibits e-mails containing offensive, discriminatory, sexual, pornographic, profane, or revolutionary content, including attachments. | 7. Beam Depo. 49:12-50:9. |
| 8. | Beam confirmed awareness, under | 8. Beam Depo. 51:5-20. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | DOM Section 47110.7 (Privacy and Confidentiality), that CDCR e-mail is property of CDCR, is not private, and is subject to monitoring. | |
| 9. | Beam confirmed awareness, under DOM Section 47110.8 (Confidential and Sensitive Information), that certain CDCR information is confidential and protected. | 9. Beam Depo. 51:22-25. |
| 10. | Beam confirmed awareness, under DOM Section 47110.17 (Enforcement), that failure to comply with CDCR e-mail policy could result in disciplinary action up to and including dismissal, and that legal action may also be taken. | 10. Beam Depo. 54:5-18. |
| 11. | Prior to March 2019, Beam received annual block training on e-mail policies on handling personal information (DOM Section 47110.9) and unsolicited e-mail (DOM Section 47110.10). | 11. Beam Depo. 55:19-56:24. |
| 12. | In 2018, Beam signed a Security Awareness Self-Certification and Confidentiality form agreeing to comply with CDCR's DOM Chapter 4, Article 45 (Information Security Policy), to protect confidential and sensitive information, and to use CDCR systems only for authorized purposes. | 12. Beam Depo. 65:21-70:21; Beam Depo. Ex. 3. |
| 13. | Beam also signed a Computing Technology Use Agreement and an SVSP Employee Responsibility/Ethics form acknowledging professional conduct standards both on and off duty. | 13. Beam Depo. 71:22-74:16; Beam Depo. Ex. 3. |
| 14. | Beam's training record confirms his completion of Information Practices Act training. | 14. Beam Depo. 83:12-25; Beam Depo. Ex. 5, CDCRSDT 250-271. |
| **B. Beam Obtains Images From an Open Homicide Investigation and Moves Them to His Personal E-mail Account** | | |
| 15. | Beam testified that he first received approximately three images of Mr. Romero's decapitated body from an | 15. Beam Depo. 109:21-110:3. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | unknown 559-area-code number. | |
| 16. | Beam responded to the sender, "Good looking out." | 16. Beam Depo. 113:6-9. |
| 17. | The images were not formal ISU photographs; Beam described them as a cell-phone screenshot in which someone had cropped and combined three images into one. | 17. Beam Depo. 277:5-24; Beam Depo. Ex. 29, DEF 8616-8618. |
| 18. | Because he did not have access to CDCR e-mail on his phone, Beam sent the images to his personal Yahoo account and then to his CDCR account. | 18. Beam Depo. 121:15-122:6, 139:5-140:8, 143:4-14; Beam Depo. Ex. 7, CDCRSDT 117. |
| 19. | The metadata places Beam's transfer of the images into his CDCR account at 4:09 a.m. on May 21, 2019. | 19. Beam Depo. 121:15-122:6, 139:5-140:8, 143:4-14; Beam Depo. Ex. 7, CDCRSDT 117. |
| 20. | eam testified that he assumed the text came from one of two former Corcoran colleagues he had seen at the Kings County courthouse that same day. | 20. Beam Depo. 119:19-121:3, 253:14-16, 262:18-263:11; Plaintiff's Exhibit 2, FRCP 30(b)(6) deposition, Mendez ("Mendez Depo.") 27:12-25. |
| 21. | One of those colleagues was Lieutenant Anthony Randolph, who told Beam he was the incident commander on the Romero homicide. | 21. Beam Depo. 119:19-121:3, 253:14-16, 262:18-263:11; Mendez Depo. 27:12-25. |
| 22. | Beam first identified the other colleague as an officer named Velazquez, but later identified the source as an Officer Grimsley ("It was Grimsley for sure."). | 22. Beam Depo. 119:19-121:3, 253:14-16, 262:18-263:11; Mendez Depo. 27:12-25. |
| **C. Beam E-mails the Romero Crime Scene Images** | | |
| 23. | Beam e-mailed the Romero crime scene images to at least sixteen people. | 23. Beam Depo. Exs. 8-20; see PMF Nos. 24-41 and the evidence cited therein. |
| 24. | At 4:09 a.m. on May 21, 2019, Beam forwarded the images from his CDCR e-mail to Michelle Beattie, a Nursing Supervisor (SRN II) at SVSP. Beam described her as part of his emergency response team and stated the purpose was to train medical staff to respond quickly to serious incidents. | 24. Beam Depo. 145:5-146:13; Beam Depo. Ex. 8. |
| 25. | At 6:57 a.m. on May 21, 2019, Beam | 25. Beam Depo. 147:25-149:21; |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | forwarded the images to Daisy Avalos and Cindey Avalos, a correctional officer and a sergeant. Beam stated these officers worked for him and were to use the images for training. | Beam Depo. Ex. 9. |
| 26. | At 9:44 a.m. on May 21, 2019, Beam forwarded the images to Lieutenant Wesley Fonseca. Beam stated that Fonseca called him and requested the photograph for training on his own facility; Beam did not ask how Fonseca knew he had the photograph. | 26. Beam Depo. 156:6-157:13; Beam Depo. Ex. 10. |
| 27. | At 12:42 p.m. on May 21, 2019, Beam forwarded the images to Captain Jason Weber with the message "Work can always get worse." Beam stated he had spoken to Weber beforehand to obtain permission to conduct training on his facility, and that Weber had cleared it with Chief Deputy Warden Atchley. | 27. Beam Depo. 153:5-155:25; Beam Depo. Ex. 11. |
| 28. | Although Beam testified that he sent the images for training, the bodies of the May 21, 2019 e-mails make no mention of training and contain no written explanation. | 28. Beam Depo. 147:21-150:14; Beam Depo. Exs. 9-11. |
| 29. | The only message in any of the four May 21, 2019 e-mails was "Work can always get worse." | 29. Beam Depo. Ex. 11 |
| 30. | On May 24, 2019, Beam sent the images to six individuals in six separate e-mails. | 30. See PMF Nos. 31-38 and the evidence cited therein. |
| 31. | At 8:35 a.m. on May 24, 2019, Beam e-mailed the images to Sergeant Paul Estrada with the message "Work can always get worse." The e-mail does not mention training; Beam stated Estrada worked for him and the images were sent for Estrada to conduct training. | 31. Beam Depo. 171:24-172:17; Beam Depo. Ex. 12. |
| 32. | At 8:36 a.m. on May 24, 2019, Beam e-mailed the images to Sergeant Lawrence Obodozie (Facility D) with the message "Work can always get worse." The e-mail does not mention training. Beam | 32. Beam Depo. 180:12-182:5; Beam Depo. Ex. 13. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | stated Obodozie was a five-day regular on second watch on Delta Facility who had either called or come over to request the images for training. | |
| 33. | At 8:37 a.m. on May 24, 2019, Beam e-mailed the images to Sergeant Natalie Rocco, whom Beam described as a relief sergeant who worked all over the prison. | 33. Beam Depo. 186:14-187:10; Beam Depo. Ex. 14. |
| 34. | At approximately 8:38 a.m. on May 24, 2019, Beam e-mailed the images to Captain William Brodie of the California Medical Facility. Brodie was a former CSP-Corcoran lieutenant who had supervised Beam, and Beam described him as a friend. | 34. Beam Depo. 189:5-199:3, 198:17; Beam Depo. Ex. 15. |
| 35. | Brodie replied, "Damn. That's nasty." Beam did not provide any training instruction in response. | 35. Beam Depo. 189:9-197:24; Beam Depo. Ex. 16 (CDCR 227). |
| 36. | Beam acknowledged that he sent the images to Brodie not for SVSP training purposes but "just because we, you know — we used to work together." | 36. Beam Depo. 189:5-199:3, 198:1-2; Beam Depo. Exs. 15-16. |
| 37. | At 8:39 a.m. on May 24, 2019, Beam e-mailed the images to Lieutenant David Ambriz (Facility D). The e-mail does not mention training; Beam stated Ambriz was going to use the images for training on Delta Facility. | 37. Beam Depo. 200:5-201:6; Beam Depo. Ex. 17. |
| 38. | At 9:52 a.m. on May 24, 2019, Beam e-mailed the images to Correctional Counselor I Ashley Lyons. The e-mail does not mention training. Beam stated the purpose was to train counselors to screen inmates properly for housing classification, and that when he spoke to Lyons, approximately three to four other counselors were present and also viewed the images. | 38. Beam Depo. 205:2-212:18; Beam Depo. Ex. 18. |
| 39. | At 8:42 p.m. on May 25, 2019, Beam e-mailed the images to Lieutenant Julian Aquino. Beam stated the e-mail was | 39. Beam Depo. 216:10-219:8; Beam Depo. Ex. 19. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | forwarded accidentally from the Ashley Lyons e-mail chain, but that he did discuss the images with Aquino for training purposes. | |
| 40. | On June 18, 2019, Beam again e-mailed the images from his Yahoo account to his CDCR account. | 40. DEF 335; Beam Depo. Ex. 20. |
| 41. | At 8:03 a.m. on June 18, 2019, Beam forwarded the images to four senior SVSP administrators: Associate Warden Paul Sullivan, Associate Warden Richard Mojica, Associate Warden Jeffrey Hughes, and Chief Deputy Warden Matthew Atchley. | 41. DEF 335; Beam Depo. Ex. 20. |
| 42. | Beam stated these administrators requested the images for a morning meeting and had not previously seen the photographs themselves, though they had previously authorized the training. | 42. Beam Depo. 221:8-222:20. |
| 43. | Sullivan responded, "Wow. Thank you." | 43. Beam Depo. Ex. 21. |
| 44. | Sullivan later forwarded the images from his CDCR account to his personal AOL account. | 44. Beam Depo. 225:7-228:22. |
| 45. | Mojica forwarded the images from his CDCR account to his personal SBCGlobal account. | 45. Beam Depo. 230:20-231:22. |
| 46. | Beam stated he had no knowledge of why either Sullivan or Mojica forwarded the images to their personal accounts. | 46. Beam Depo. 230:20-231:22. |
| 47. | Weber had previously forwarded the images to Hughes on June 1, 2019, from a state-issued iPhone; Hughes responded "Ty" (thank you). | 47. Beam Depo. 232:5-233:17. |
| 48. | None of Beam's e-mails transmitting the images says a word about training; the only text in any of them is "Work can always get worse." | 48. Beam Depo. 147:21-150:14; Beam Depo. Exs. 8-18. |
| 49. | Beam denies that the line "Work can always get worse" was a joke. | 49. Beam Depo. 247:15-25. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 50. | Although Beam insisted that he never sends e-mails without first talking to the recipient, he conceded that he may have spoken to Estrada, Ambriz, and Lyons only after sending them the images. | 50. Beam Depo. 174:10-15, 201:14-18, 210:16-19. |
| **D. The Chief Deputy Warden Orders Beam to Stop; Beam Does Not Disclose His E-mails** | | |
| 51. | On June 18, 2019, after receiving the images, Chief Deputy Warden Atchley replied to Beam: "Yikes. That's worse than I thought. Where did you get this pic?" | 51. Beam Depo. Ex. 25. |
| 52. | Beam responded: "The incident commander is a buddy of mine." | 52. Beam Depo. 237:24-238:14; Beam Depo. Ex. 26. |
| 53. | At deposition, Beam stated he was not certain Randolph sent the images and had only assumed it: "I don't know. I know somebody in that phone record did, and I wish I knew who. I honestly wish I knew who." | 53. Beam Depo. 267:22-24. |
| 54. | On June 19, 2019, Atchley sent Beam a follow-up e-mail stating: "Copy that. I responded to the e-mail. And since I don't know the status of any of that situation, or even if that was supposed to get out, don't send that to anyone else. It's a screenshot from a cell phone, and that gives me — leads me to believe this shouldn't be passed around. If you know any different, feel free to call me."<br>Beam then acknowledged the order without disclosing that he had already sent the images to at least ten people | 54. Beam Depo. 238:20-239:2; Beam Depo. Ex. 26; Beam Depo. 256:11-23. |
| 55. | That same day, Beam responded "10-4," acknowledging the direct order. | 55. Beam Depo. 239:9-240:21. |
| 56. | Beam then deleted the images from his CDCR e-mail account, his Yahoo e-mail account, and his personal cell phone. | 56. Beam Depo. 239:9-240:21. |
| 57. | Beam admitted that when he responded "10-4," he did not disclose to Atchley that he had already sent the images to at | 57. Beam Depo. 256:11-23. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | least ten other people. | |
| 58. | Beam also stated that Atchley already knew he had sent the images for training purposes. | 58. Beam Depo. 256:11-23. |
| **E. Beam's Accounts Shift** | | |
| 59. | Beam has attributed the images to at least five different people: (1) Lieutenant Randolph ("The incident commander is a buddy of mine."); (2) Officer Velazquez; (3) Officer Grimsley ("It was Grimsley for sure."); (4) Officer Rubio (Rubio "was the one whom took then ultimately sent the crime scene photos to people."); and (5) Officer Cervantez ("The only I'm sure sent it to me was Cervantez."). | 59. Beam Depo. 237:24-238:14 (Randolph); Beam Depo. 119:19-121:3 (Velazquez); Beam Depo. 263:5-11 (Grimsley); CDCR 168, Beam Depo. Ex. 30 (Rubio); Beam Depo. 270:4-5 (Cervantez). |
| 60. | At deposition, Beam first denied ever telling an investigator that Rubio was the source ("No, I don't") and recanted only when shown his own letter. | 60. Beam Depo. 269:13-271:22. |
| 61. | [redacted] | 61. Mendez Depo. 54:20-25. |
| 62. | At his deposition, Beam testified: "I honestly wish I knew who." | 62. Beam Depo. 267:22-24. |
| 63. | Beam told the Office of Internal Affairs ("OIA") in his February 10, 2020 interview that he received the images in March or April 2019; at deposition, he returned to May 21, 2019, the day he e-mailed them. | 63. Beam Depo. 242:2-16, 263:19-264:8. |
| 64. | The images entered CDCR's e-mail system at 4:09 a.m. on May 21, 2019, before Beam could have encountered Randolph at the Kings County courthouse. | 64. CDCRSDT 366; see PMF Nos. 20-21. |
| 65. | Beam testified both that he was at home when he forwarded the images and that "I was at work at that time. I wasn't at home." | 65. Beam Depo. 135:2-5, 143:11-14, 144:19-20. |
| 66. | Beam testified, "When I received them, I did not know of the incident," and that he did not know the images came | 66. Beam Depo. 112:6-18. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | from Corcoran. | |
| 67. | Beam also testified that Randolph had told him that day that he was the incident commander on the Romero homicide, and that Beam assumed at the time that the images came from Corcoran. | 67. Beam Depo. 163:10-12, 253:14-254:13. |
| 68. | In a single exchange, Beam testified both that "[y]ou can tell it was law enforcement related" and "No, I could not." | 68. Beam Depo. 114:5-15. |
| 69. | [redacted] | [redacted] |
| 70. | [redacted] | [redacted] |
| **F. CD e ects t e ra n ng Just cat on an usta ns M scon uct gainst Beam** | | |
| 71. | OIA conducted an investigation regarding the allegation that Beam "inappropriately accessed and/or transmitted confidential information/evidence pertaining to the homicide of inmate Luis Romero." | 71. DEF 331. |
| 72. | [redacted] | [redacted] |
| 73. | [redacted] Beam's e-mails and found "a total of 29 e-mails that included the crime scene photo." | [redacted] |
| 74. | The OIA investigator "reviewed the 24 different CDCR state email addresses either sending or receiving the same cell phone screenshot depicting the crime scene photographs." | 74. DEF 334. |
| 75. | [redacted] | [redacted] |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | account and technology, needlessly subjected CDCR to liability, and brought discredit to himself and the Department. | |
| 76. | [redacted] | [redacted] |
| 77. | [redacted] | [redacted] |
| 78. | [redacted] | [redacted] |
| 79. | [redacted] | [redacted] |
| 80. | [redacted] | [redacted] |
| 81. | [redacted] | [redacted] |
| 82. | [redacted] *Skelly* apology, maintaining that he did nothing improper and that his training saved lives. | 82. Beam Depo. 284:24-285:9. |
| 83. | On-the-job training ("844") sheets memorialize the trainings conducted on a particular day. | 83. Beam Depo. 176:14-20. |
| 84. | Beam has no 844 sheets to support that he conducted any training using the images. | 84. See Beam Depo. 288:20-289:22, 300:15-303:20. |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 85. | [redacted] | [redacted] |
| 86. | [redacted] | [redacted] |
| 87. | *No training records exist.* On-the-job training ("844") sheets memorialize the trainings conducted on a given day and Beam has no 844 sheets reflecting any training using the images. Beam testified that he printed the images, passed them around, and shredded them, leaving no documentary trace, and the supporting records have not been produced. | 87. (Beam Depo. 176:14-20; 288:20-289:22, 300:15-303:20.) |
| 88. | Any supporting records of these trainings either do not exist or have not been produced. | 88. (Beam Depo. 300:15-303:20.) |

| No. | PLAINTIFF'S MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 89. | According to Plaintiff's correctional practices expert Rick Winistorfer, "the fact that there was no content in the emails sent by Lt. Beam, not even a stated purpose for the email, leads one to believe that he was merely sending these photographs out for their shock value without any thought to an active investigation and their evidentiary status." | Exhibit __, Winistorfer Report at 15) |
| 90. | Plaintiff's expert Rick Winistorfer found, "It is further evident that Lt. Beam's gave no thought about what happens to his email once it is received by someone else and who, or how many people they may send it to." | (Winistorfer Report at 15) |
| 91. | Moreover, Dr. Gharibian's psychological expert report explicitly describes the causation, that when Plaintiff "saw the photos online, she started to feel anxious and was having nightmares." | Exhibit __ (Dr. Gharibian report at 3) |
| 92. | Before she saw the photos online, Ms. Solares did not know that her son had been beheaded. | Solares Depo. 100:15-17 |
| 93. | In the first photo she saw, she saw that "he didn't' have his head. And he was wearing a boxer, and everything was covered I blood." | Solares Depo. 102:5-8 |
| 94. | In the second photo she saw her son's head on a "bed or a table" and "in the walls were some letters written in blood." | Solares Depo. 102:12-15 |

Dated: November 20, 2026

Respectfully submitted,

LAW OFFICES OF JUSTIN STERLING

By: /s/ Justin E. Sterling
Justin E. Sterling
Attorneys for Plaintiff Dora Solares

LAW OFFICES OF ERIN DARLING

By: /s/ Erin Darling
Erin Darling
Attorneys for Plaintiff Dora Solares