Justin E. Sterling, State Bar No. 249491
LAW OFFICES OF JUSTIN STERLING
Justin@SterlingDefense.com
15760 Ventura Blvd. Suite 700
Encino, CA 91436
Tel. (818) 995-9452/Fax. (818) 824-3533

Erin Darling, State Bar No. 259724
LAW OFFICES OF ERIN DARLING
Erin@ErinDarlingLaw.com
3435 Wilshire Blvd. Suite 2910
Los Angeles, CA 90010
Tel. (323) 736-2230

Attorneys for Plaintiff Dora Solares

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

DORA SOLARES, an individual,

Plaintiff,

v.

RALPH DIAZ, in his individual capacity, KENNETH CLARK, in his individual capacity, JOSEPH BURNS, in his individual, and DOES 1 TO 15, in their individual capacities

Defendants.

Case No. 1:21-cv-01349-LHR

**REDACTED**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT JACOB FUGATE'S MOTION FOR SUMMARY JUDGMENT**

**Judge: Hon. Lee H. Rosenthal**

Plaintiff Dora Solares hereby opposes the Motion for Summary Judgment filed by Defendant Jacob Fugate. *See* ECF Dkt. No. 99, Motion for Summary Judgment. Plaintiff requests that the Court deny this motion.

Respectfully submitted,

Dated: December 20, 2026

LAW OFFICES OF ERIN DARLING

By: */s/Erin Darling*
Erin Darling,
Attorneys for Plaintiff Dora Solares

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 2

A. Correctional Officer Jacob Fugate Photographs Crime Scene for the ISU ..... 2

B. Fugate Uses Personal Cell Phone Fugate to Photograph Images of Romero Crime Scene ..... 3

C. Fugate Shows Photographs to His "Lady" Then Denies It ..... 4

D. Fugate Keeps Photos on His Cell Phone, Including During February 9, 2023, Interview ..... 4

E. Fugate Shows Crime Scene Photos on His Cell Phone While on Duty on ..... 5

F. July 30, 2024, Interview ..... 7

G. Policy and Training ..... 8

H. Internal Affairs Sustained Misconduct Findings Against Fugate ..... 8

I. Plaintiff Dora Solares's Injuries ..... 9

J. Fugate's Lies, Destruction of Evidence, and Marshall and Alvarado's Description of the Images Fugate Showed Them, Create a Triable Issue Whether Fugate is the Source of the Images Ms. Solares Saw Online ..... 10

III. LEGAL STANDARD ON SUMMARY JUDGMENT ..... 12

IV. PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM SURVIVES DEFENDANT'S MOTION ..... 13

A. Defendant Fugate Violated Romero's Constitutional Rights, Including the Right to Substantive Due Process (42 USC § 1983) ..... 13

1. Defendant Fugate Violated Plaintiff's Right to Privacy ..... 13

2. A Reasonable Jury Could Find That Fugate Was a Source of the Images That Circulated Within CDCR and Online ..... 16

3. Fugate Was a Source of the Images That Circulated Within CDCR and Online ..... 18

B. Defendant Fugate Is Not Entitled to Qualified Immunity ..... 20

V. NEGLIGENCE ..... 21

A. Fugate Owed Ms. Solares a Duty of Ordinary Care ..... 21

B. Breach and Causation ..... 23

VI. INVASION OF PRIVACY .......... 24

VII. SUPPLEMENTAL JURISDICTION .......... 25

VIII. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Admiralty Fund v. Tabor*, 677 F.2d 1297 (9th Cir. 1982) ........ 12

*Akona v. United States*, 938 F.2d 158 (9th Cir. 1991) ........ 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........ 13, 16

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ........ 20

*Brown v. Metro by T-Mobile*, 768 F. Supp. 3d 1068 (C.D. Cal. 2024) ........ 15

*Brown v. USA Taekwondo*, 11 Cal. 5th 204 (2021) ........ 22

*Bryant v. County of Los Angeles*, No. 20-cv-9582-JFW, 2020 WL 8024857 (C.D. Cal. Dec. 28, 2020) ........ 22

*Burgess v. Superior Court*, 2 Cal. 4th 1064 (1992) ........ 24

*Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764 (2011) ........ 22

*Catsouras v. Department of California Highway Patrol*, 181 Cal. App. 4th 856 (2010) ........ 2, 22–25

*Christensen v. Superior Court*, 54 Cal. 3d 868 (1991) ........ 21

*City of Chicago v. International College of Surgeons*, 522 U.S. 156 (1997) ........ 25

*Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162 (9th Cir. 2006) ........ 12

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ........ 13, 16

*Doe v. John F. Kennedy University*, No. 13-cv-1137-DMR, 2013 WL 4565061 (N.D. Cal. Aug. 27, 2013) ........ 24

*Floyd v. Laws*, 929 F.2d 1390 (9th Cir. 1991) ........ 19

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........ 20, 21

*Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978) ........ 18, 19

*Kinsey v. Macur*, 107 Cal. App. 3d 265 (1980) ........ 24

*Lamorie v. Davis*, 485 F. Supp. 3d 1065 (D. Ariz. 2020) ........ 15

*Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012) ........ 13–15, 18–21

*Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008) ........ 19

*Moore v. Rodriguez*, 2021 WL 2222590 (S.D. Cal. June 2, 2021) ........ 22

*National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004) ........ 13

*Nicholson v. City of Los Angeles*, 935 F.3d 685 (9th Cir. 2019) .......... 14

*Pauly v. Vaquez*, 2016 WL 9443732 (D.N.M. Aug. 10, 2016) .......... 20

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) .......... 13, 17

*Robinson v. York*, 566 F.3d 817 (9th Cir. 2009) .......... 20

*Rochin v. California*, 342 U.S. 165 (1952) .......... 13, 14

*Rosenbaum v. Washoe County*, 663 F.3d 1071 (9th Cir. 2011) .......... 15

*Rowland v. Christian*, 69 Cal. 2d 108 (1968) .......... 22, 23

*Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953 (1997) .......... 23

*Saucier v. Katz*, 533 U.S. 194 (2001) .......... 20

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) .......... 12, 17

*Serrano v. Francis*, 345 F.3d 1071 (9th Cir. 2003) .......... 20

*Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200 (1998) .......... 24

*Smith v. Wade*, 461 U.S. 30 (1983) .......... 19

*Solares v. Burns*, No. 1:21-cv-01349-JLT-BAM, ECF No. 26 (E.D. Cal. Mar. 28, 2024) .......... 15, 18, 20

*Taylor v. Barkes*, 575 U.S. 822 (2015) .......... 20, 21

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) .......... 12

*Tolan v. Cotton*, 572 U.S. 650 (2014) .......... 13

*Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir. 1975) .......... 24

*Wilson v. Layne*, 526 U.S. 603 (1999) .......... 20

*Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003) .......... 19

**Constitutional Provisions**

U.S. Const. amend. XIV .......... 14, 20

**Statutes**

28 U.S.C. § 1367(a) .......... 25

42 U.S.C. § 1983 .......... 13, 18

Cal. Civ. Code § 1714(a) .......... 21, 22

Cal. Gov't Code § 820(a) .......... 21

Cal. Penal Code § 647.9 .......... 23

**Rules**

Fed. R. Civ. P. 37(e) & advisory committee's note to 2015 amendment ........ 17

**Other Authorities**

Judicial Council of California Civil Jury Instructions (CACI) Nos. 430, 431 ........ 24

Cal. Dep't of Corr. & Rehab., Department Operations Manual § 12070.18 ........ 8, 23

## MEMORANDUM OF POINTS & AUTHORITIES

## I. INTRODUCTION

On March 9, 2019, Luis Romero's decapitated, mutilated corpse was found in Cell 46 at California State Prison (CSP) - Corcoran. Mr. Romero was murdered by his cellmate, Jaime Osuna. Osuna had gone twenty-two months without a cellmate. Defendant Jacob Fugate was the Investigative Services Unit ("ISU") officer who photographed that scene; he understood that he was "solely responsible for processing the evidence." Days later, he then did what no legitimate governmental purpose could justify. He brought his personal iPhone into the prison in violation of policy, photographed the death images on his ISU computer monitor, and carried those images of Mr. Romero's mutilated remains on his personal phone for five years. He had them transferred to a new phone at a retail phone store. He concealed them from a CDCR investigator who asked him directly about the leaked photographs in 2023. Then, in 2024 he displayed them, in a darkened housing-unit office, to two correctional officers who had nothing to do with the investigation. When he was summoned to an interview about the images, he deleted the photos from his phone.

Fugate's motion rests on a false premise that there is "no evidence" he transmitted the images or caused them to become public, and that Ms. Solares's injuries flow solely from seeing the images online. Both halves of that premise fail. *First*, Fugate misstates the nature of the injury and overlooks Ninth Circuit authority that settles this issue. The constitutional deprivation is a government official's unwarranted exploitation of a mother's control over her son's death images, not publication alone. This Court has already held, in this case, that the relevant question is not whether the publication of the photographs caused Plaintiff's damages, but rather, whether the defendant's conduct caused the deprivation of Plaintiff's rights. That constitutional right is clearly established. *Second*, the record contains substantial circumstantial evidence from which a jury could find that Fugate's images were a source of the images that circulated within CDCR and online. The images Lieutenant Erik Beam distributed were, like Fugate's, cell-phone photographs of crime-scene images displayed on a computer screen. By one of Fugate's own accounts, he took his photographs in the same week in which, he says, the images reached the public domain. Fugate's repeated falsehoods about these very images, and destruction of them once an investigation loomed, are for the jury to weigh.

Fugate's attacks on the state-law claims fare no better. His negligence argument rests on the "special relationship" doctrine, which governs claims that a defendant failed to protect the plaintiff from a third party. Fugate's own affirmative conduct is governed by the general duty of ordinary care, and the authority on which he relies, *Catsouras*, held that officers owe a decedent's family a duty not to exploit death images for purposes unrelated to official business. His invasion-of-privacy argument depends on the same false premise that there was no public disclosure. The motion should be denied.

## II. STATEMENT OF FACTS

### A. Correctional Officer Jacob Fugate Photographs Crime Scene for the ISU

On March 9, 2019, Luis Romero's mutilated body was found in Cell 4. (Plaintiff's Statement of Genuine Disputes and Objections, Plaintiff's Additional Material Facts and Supporting Evidence [redacted] (PMF 9.)

[redacted]

**B. Fugate Uses Personal Cell Phone Fugate to Photograph Images of Romero Crime Scene**

Fugate estimates that, "about three weeks" later (per his deposition testimony), or "either the day of the Osuna and Romero incident or the following work week" (per his July 30, 2024 interview), he photographed the crime scene images as they were displayed on his work-station computer monitor. (PMF 15.) Fugate testified at his deposition that he pulled the photos up from the squad ISU shared folder. (PMF 16.) The photographs "were displayed on his workstation computer after accessing the ISU share folder." (PMF 16.) Fugate admitted, "If I wasn't in ISU I wouldn't have had access to them." (PMF 17.)

That day, Fugate "was on duty" (PMF 18) and brought his personal cell phone into CSP-Corcoran (PMF 18.) Fugate had brought his personal iPhone into CSP-Corcoran before. (PMF 18.) Fugate knew when he brought in his personal iPhone that he was in violation of a DOM regulation. (PMF 18.) Fugate

admitted he took "three photos" (PMF 19) with "zoomed variation. It was like an overall, then a medium zoom and then a close-up." (PMF 19.) Fugate also admitted, "There was no purpose for me to take a photo for ISU on my personal phone." (PMF 20.) However, Fugate testified that "it was my intention" to [redacted]

**C. Fugate Shows Photographs to His "Lady" Then Denies It**

[redacted]

However, at his deposition two years later, Fugate testified: "I never showed her the photos." (PMF 25.) Even at his deposition, Fugate seemed to not have his story straight: "Are you talking about the time I showed my lady or tried to show my lady the photo?" (PMF 25.)

At another time, in response to an interrogatory to him, Fugate even went so far as to later claim that his "lady" was "no one." (PMF 26.) In support of this motion, Fugate offers yet another version, that his "lady" "refused to see the images." (PMF 27.)

**D. Fugate Keeps Photos on His Cell Phone, Including During February 9, 2023, Interview**

[redacted]

[redacted]

**E. Fugate Shows Crime Scene Photos on His Cell Phone While on Duty on**

[redacted]

[redacted]

Fugate offered this justification showing the crime scene photos on his cell phone: "I mean, you can't say it's therapy. But when you see something like that, you got to talk about it. The easiest way to talk about it is to talk to people that go through similar things." (PMF 49.) Fugate also stated, "So maybe just by looking at it later if I figured out how to process it better." PMF 49.) However, despite the purported need to "process it," Fugate admitted he had never underwent peer support counseling. (PMF 50.) ("I did not do peer support.") Despite the offer of "peer" support, Fugate reasoned, "I'm not comfortable doing that because they're not going to understand what we have to deal with." (PMF 50.) Fugate also never attempted to see a licensed therapist about what he had seen in the Romero crime [redacted]

**F. July 30, 2024, Interview**

[redacted]

[redacted]

**G. Policy and Training**

At his deposition, Fugate acknowledged that he knew he had to comply with all laws, including California Code of Regulations Tile 15, departmental policy, applicable operating procedure, and institution post orders. (PMF 57.) Fugate also admitted he was familiar with the "code of conduct." (PMF 58.) This oath includes the following: "Confidential information received in my official capacity shall remain undisclosed unless disclosure is necessary in the performance of my duty." *Id.*

At his deposition, Fugate admitted he received DOM training on state-issued cell phones. (PMF 59.) The policy, DOM § 12070.18, prohibits personal cell phones within any CDCR institution. (PMF 59.)

Fugate was familiar with the "chain of custody" (PMF 60), which he described as a "paper trail for everywhere [a piece of evidence] goes." *Id.* Fugate acknowledged that photographs uploaded onto an ISU computer "would only be accessible by anyone in ISU." (PMF 17.) "You have to be in the ISU unit to have access to squad share." (PMF 17.)

Fugate was also subject to Operational Procedure 202, Control of Evidence, which states: "The ISU Officers are solely responsible for maintaining the custody of the evidence within the Main Evidence Room. This area is located inside the ISU Office area and only the Evidence Officer has a key to it." (PMF 61.) OP 202, Control of Evidence, states: "The evidence collection process is a total package, which encompasses the securing of the scene, the finding and identification of evidence items, documentation, preservation and collection of evidence items as well as maintaining a chain of custody. Maintaining the integrity of the evidence is paramount in this process." (PMF 61.) OP 202 also states "The ISU Evidence Officer shall only print photos upon request for legitimate penological issues such as disciplinary hearings." (PMF 62.) As for any evidence removal request: "Should an employee request copies of photos…the requesting employee will be required to complete the Evidence Removal Request form." (PMF 62.)

[redacted]

[redacted]

**I. Plaintiff Dora Solares's Injuries.**

Ms. Solares learned of her son's murder from the news and later saw photographs of his mutilated remains online. (PMF 76.) Her examining psychologist, Dr. Emin Gharibian, diagnosed Persistent Depressive Disorder and Other Specified Trauma and Stressor Related Disorder. (PMF 79.) Dr. Gharibian did not attribute her condition solely to having seen the images online. He found that she "continues to struggle with ongoing depression and sadness due to not only losing her son, but learning

that he was murdered, seeing his photos online, knowing that the photos are still online, and that nobody has been held accountable." (PMF 80.)

Fugate's conduct came to light in  August 2025, and Plaintiff named Fugate in the Third Amended Complaint in September 25. (ECF No. 71) Plaintiff learned "that crime scene photos were copied, shared, and shown to individuals who were not involved in the investigation." (PMF 84.) This has affected Ms. Solares's daily life: she struggles to sleep, experiences nightmares, her anxiety has increased, her appetite has been affected. (PMF 85.) In February 2026, Ms. Solares's physician found her blood pressure and blood sugar elevated; she was losing weight, sleeping poorly, and her "nerves were really bad." She then sought mental-health treatment for the first time, beginning psychotherapy in February 2026 and psychiatric care in March 2026. (PMF 81).

Ms. Solares learned "that crime scene photos were copied, shared, and shown to individuals who were not involved in the investigation." (PMF 84) This has affected Ms. Solares's daily life: she struggles to sleep, experiences nightmares, her anxiety has increased, her appetite has been affected. (PMF 85.) What is left is a feeling of pain that comes from powerlessness, Ms. Solares "cannot erase them. It has already happened. My son's dignity cannot be protected from something that has already happened." (PMF 86.)

**J. Fugate's Lies, Destruction of Evidence, and Marshall and Alvarado's Description of the Images Fugate Showed Them, Create a Triable Issue Whether Fugate is the Source of the Images Ms. Solares Saw Online**

[redacted]

[redacted]

[redacted]

## III. LEGAL STANDARD ON SUMMARY JUDGMENT

"Summary judgment is only appropriate if, viewing the evidence in the light most favorable to the party opposing the motion, the court finds that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Taylor v. List*, 880 F. 2d 1040, 1044 (9th Cir. 1989). After drawing inferences most favorable to the non-moving party, summary judgment may be granted only if all reasonable inferences defeat the non-movant's claims. *See, e.g.*, *Admiralty Fund v. Tabor*, 677 F. 2d 1297, 1298 (9th Cir. 1982). When the opposing parties present conflicting accounts of what happened, there is a triable issue of material fact that presents credibility issues that should be determined by a jury. *See Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1172-73 (9th Cir. 2006). Evidence examined must include "any expert testimony proffered by the plaintiff," to determine whether the official's story is internally consistent and consistent with other known facts. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Where, as here, the moving party's showing rests on his own testimony, the nonmoving party may defeat summary judgment with circumstantial evidence and with evidence that impeaches the movant's credibility. "Credibility determination, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted). And the factfinder "is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (internal quotation omitted).

## IV. PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM SURVIVES DEFENDANT'S MOTION

### A. Defendant Fugate Violated Romero's Constitutional Rights, Including the Right to Substantive Due Process (42 USC § 1983)

#### 1. Defendant Fugate Violated Plaintiff's Right to Privacy.

Family members have privacy interests in images of their loved ones' demise. *Nat. Archives & Records Admin v. Favish*, 541 U.S. 157, 171 ("[W]e hold that FOIA recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images."). Drawing on *Favish*, the Ninth Circuit in *Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012) observed the "well-established cultural tradition acknowledging a family's control over the body and death images of the deceased" and held that for "precisely the same reasons, we conclude that this right is also protected by substantive due process." *Id.* at 1154. In *Marsh*, a district attorney photocopied sixteen autopsy photographs of Plaintiff's dead two-years-old son and then shared one of the autopsy photographs with members of the press; the photograph was never published. *Id.* at 1152. Relying on the Supreme Court's holding in *Rochin v. California*, 342 U.S. 165, 173 (1952), the Ninth Circuit in *Marsh* held that "*public display* of death images is the kind of conduct that is likely to cause the family profound grief and therefore 'shocks the conscience' and 'offend[s] the community's sense of fair play and decency.'" *Id.* at 1155 (quoting *Rochin*, 342 U.S. at 172-173).

Under the Fourteenth Amendment, an officer's conduct is unconstitutional when it "shocks the conscience." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692-93 (9th Cir. 2019). This standard is met where the conduct in question "offend[s] the community's sense of fair play and decency." *Rochin v. California*, 342 U.S. 165, 173 (1952). Applying this standard in *Marsh*, the Ninth Circuit held the Fourteenth Amendment "protects a parent's right to control the physical remains, memory and images of a deceased child against the unwarranted public exploitation by the government." *Marsh*, 680 F.3d at 1154. "[A] parent's right to control a deceased child's remains and death images flows form the well-established substantive due process right to family integrity. *Id.* "This intrusion into the grief of a mother over her dead son – without any legitimate governmental purpose – 'shocks the conscience' and therefore violates Marsh's substantive due process rights." *Id.* at 1155.

Here, a jury could easily conclude that Defendant Fugate's conduct shocked the conscience when he photographed graphic crime scenes on his personal cell phone, withheld that information during an investigator's interview, transferred the photos to a new phone, and then showed the gruesome photos years later to at least two individuals with no role in the murder investigation and who were not a part of the ISU. Just as *Marsh* involved one photograph being shared to two people who had no professional basis to possess a death image, here, Fugate showed two people who had no professional justification to see them, except Fugate showed multiple death images. Fugate had no legitimate governmental purpose for showing Marshall and Alvarado these images of Romero's mutilated body and body parts.

Defendant's motion focuses on the lack of publication by Fugate. This argument avoids the basic facts in *Marsh*, in which the district attorney shared the autopsy photo of Plaintiff's son with two people who were not entitled to see it, and the photograph was never published and never appeared on the internet. Defendant Fugate's focus on the lack of any personal publication by Fugate misunderstands the privacy right recognized in *Marsh*: the government's duty to treat the dead with respect, and a bereaved mother's right to control the death images of her loved ones. "This privacy right belongs, not to the deceased, but to the survivors." *Marsh* at 1153, n. 3. Defendant Fugate cruelly and casually showed multiple horrific images of Plaintiff's son to multiple people who had no justification for seeing them. A reasonable jury could easily find that such "unwarranted public exploitation of death images degrades the respect accorded to families in their time of grief." *Id.* at 1155. That Fugate's conduct did not include

publication does not excuse his conduct any more than the conduct in Marsh made excusable because news outlets never published the autopsy photo.

This Court has already rejected the argument that Fugate advances. Ruling no Defendant Burnes's motion to dismiss, the Court declined to read *Marsh* as limiting publication, rejecting "the broad assertion that without publication of death images, there can be no" substantive due process violation. *See Solares v. Burns*, No. 1:21-cv-01349-JLT-BAM, (ECF No. 26, at 8) (E.D. Cal. Mar. 28, 2024). The Court explained that "the relevant question is not whether the *publication* of the photographs caused Plaintiff's damages, but rather, whether *Burnes' conduct* cause the deprivation of Plaintiff's rights." *Id.* (italics in the original). Fugate offers no reason to revisit that ruling, which applies with equal force to an officer who, like the allegations as to Burnes, took and shared Mr. Romero's death images for improper personal purposes.

Defendant Fugate tries to wade out of *Marsh* by relying on two district court cases, neither of which help his position upon examination. In *Lamorie v. Davis*, 485 F.Supp.3d 1065, 1072 (D. Ariz. 2020) a mother sued a county and county employees for taking her child off life support and cremating her without her permission. The District Court held that *Marsh* did not establish a procedural right to a notice of cremation, and even if it did, cremation did not "shock the conscience" as the body "was not mutilated, nor her burial site desecrated. She was cremated at a funeral home." *Id.* at 1073. *Lamorie*'s lack of impermissible public sharing of gruesome death photos is a dispositive factual distinction. Reliance on *Brown v. Metro by T-Mobile*, 768 F.Supp.3d 1068 (C.D. Cal. 2024) is incorrect for the same reason: the facts have nothing to do with the sharing of private death images. In *Brown*, the district court granted a motion to dismiss an invasion of privacy claim over footage of a public police shooting, not private death images. The district court noted that the shooting took place in a public space along a busy, public highway. "[G[iven that the Footage does not portray death images, nothing about the content renders the Footage affirmatively not newsworthy." *Id.* at 1088. Defendant Fugate thus relies on a case that makes the same distinction that Plaintiff does here, that some private death images are different than public violence because it implicates a family's interest in honoring their bereaved's mortal remains. When such sensitive, private images are shared for morbid and sensationalist purposes no governmental interest is served.

Nor does *Rosenbaum v. Washoe County*, 663 F.3d 1071 (9 th Cir. 2011), assist Fugate. *Rosenbaum* involved offensive words spoken to a plaintiff's children during an arrest. It says nothing about death

images, a category of conduct the Ninth Circuit has held "shocks the conscience" when undertaken "without any legitimate governmental purpose." *Id.* at 1155. Fugate concedes there was no such purpose:

[redacted]

**2. A Reasonable Jury Could Find That Fugate Was a Source of the Images That Circulated Within CDCR and Online**

Fugate's motion rests on his own declaration that he "did not share, text, email, distribute, transmit, disseminate, or otherwise cause the publication of any images." (Dkt. No. 99-4, Fugate UF ¶ 14) A moving party cannot obtain summary judgment by asking the Court to believe him. *Anderson*, 477 U.S. at 255. The question is whether, viewing the evidence in Plaintiff's favor, a reasonable jury could find that Fugate's cell phone's crime scene images were a source of the images that spread through CDCR and onto the internet. A jury could, for at least five reasons.

[redacted]

[redacted]

[redacted]

[redacted]

**3. Fugate Was a Source of the Images That Circulated Within CDCR and Online**

Fugate's causation argument fails for three distinct reasons:

*First*, Fugate asks the wrong causal question. Section 1983 requires that the defendant's conduct cause the deprivation of the plaintiff's rights. As this Court has held in this case, "the relevant question is not whether the *publication* of the photographs caused Plaintiff's damages, but rather, whether [defendant's] *conduct* cause the deprivation of Plaintiff's rights." (ECF No. 26, at 8) The right at stake is "a parent's right to control the physical remains, memory and images of a deceased child against the unwarranted public exploitation by the government." *Marsh*, 680 F.3d at 1154. Fugate denied Ms. Solares that control when, without any governmental purpose, he made his own copies of her son's death images, kept them for five years on multiple personal devices, and then exhibited them to others, like a macabre "trophy." (PMF 75) The causal connection between that conduct and that deprivation is direct. *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts "that causes the deprivation of which complaint is made." *Id.* "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a seirs of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743-44.

*Second*, even if Plaintiff could not prove compensable emotional harm traceable to Fugate, the claim would survive. A plaintiff who proves a constitutional violation is entitled to nominal damages. *Floyd v. Laws*, 929 F.2d 1390, 1402 (9th Cir. 1991). Punitive damages are available where, as here, the jury could find that the defendant acted with "reckless and callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1120

(9th Cir. 2008) (punitive damages may accompany a nominal award). As those remedies do not depend on proof of compensable loss, Fugate's argument about the source of Plaintiff's emotional injuries, while far-fetched, if taken as true, still cannot support summary judgment on liability. At most, this goes to the measure of compensatory damages, which belongs to the jury.

*Third*, the report supports compensatory damages caused by Fugate. In Marsh, the photograph was never published but the Ninth Circuit recognized the mother's anguish in learning that a government official had exploited her son's death image, and her fear that she would encounter it. *Marsh*, 680 F.3d at 1155. The same is true here. Mr. Solares. Her symptoms intensified after she learned of Fugte's actions. (PMF 85-86.) A plaintiff's own testimony is sufficient to support an award of emotional-distress damages. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003).

Fugate's reliance on (cherry-picked portions of) Dr. Gharibian's report is misplaced. Dr. Gharibian dd not find that Ms. Solares's distress has a single cause. He attributed her ongoing depression to multiples causes, including: the loss of her son; his murder; seeing the photographs online; "knowing that the photos are still online"; and the fact "that nobody has been held accountable." (PMF 80.). These injuries cannot be neatly parsed. Apportioning the harm is the function of a jury. To the extent that Ms. Solares's injuries flow from the images she saw online, the evidence set out above permits the jury to find that Fugate's images were the source. A Defendant whose conduct is one of seeral concurrent causes of an injury is not relieved of liability because others contributed." *See Johnson*, 588 F.2d at 743-44.

## B. Defendant Fugate Is Not Entitled to Qualified Immunity

Qualified immunity presents two questions: "(1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The first question is answered above, the second factor is discussed here.

A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he [is] doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) That does not mean an official action is protected "unless the very action in question has previously been held unlawful'; it means only that "in the light of pre-existing law the unlawfulness

must be apparent." *Id.* Prior authority need not present "identical or even 'materially similar' facts," it need only have provided defendants fair warning that their conduct was unlawful. *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2013); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002)("officials can still be on notice that their conduct violates established law even in novel factual circumstances.") The touchstone is whether "every reasonable official would have understood that what he is doing violates th[e] right." *Taylor v. Barkes*, 675 U.S. 822, 825 (2015). No "case directly on point" is required, though "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741. The doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

The right at issue was clearly established long before Fugate acted. In 2012, the Ninth Circuit n Marsh held that the Fourteenth Amendment "protects a parent's right to control the physical remains, memory and images of a deceased child against the unwarranted public exploitation by the government." *Marsh*, 680 F.3d at 1154. Marsh gave notice to every government official from May 2012 forward. This Court has held so in this case. IT concluded that the absence of clearly established case law identified in Marsh "was limited to instances prior to its decision," and that "when Defendants shared the photographs of Mr. Romero's remains for personal purposes, they had 'fair warning' that their conduct was unlawful. (ECF No. 26, at 12-13 (citing *Pauly v. Vaquez*, 2016 WL 9443732, at *6 (D.N.M. Aug. 10, 2016) ("the right was not clearly established before May 29, 2012, the date *Marsh* was decided"). Fugate's conduct, from taking photos on his cell phone in 2019 through his display of them in 2024, postdates *Marsh* by seven to twelve years.

Fugate's qualified immunity argument does not engage *Marsh*'s holding or this Court's prior ruling. It simply recasts his conduct as "retaining crime scene images on his cellphone." That is not the conduct [redacted] facts viewed in light most favorable to the plaintiff, "every reasonable official would have understood that what he is doing violates" Ms. Solares's rights. *Taylor*, 575 U.S. at 825. Indeed, Fugate's supervisors

[redacted]

## V. NEGLIGENCE

### A. Fugate Owed Ms. Solares a Duty of Ordinary Care

Fugate's negligence argument rests on a mistaken premise that Plaintiff must establish a "special relationship" to establish a duty. (ECF No. 99-1 at 15) Under California law, "[e]veryone is responsible…for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." Cal. Civ. Code § 1714(a). That general duty applies to a public employee to the same extent as a private person. Cal. Gov't Code § 820(a). California law has long recognized a duty to handle dead bodies with due care because such conduct "is likely to cause serious emotional distress to members of the decedent's immediate family regardless of whether they observe the actual negligent conduct to the remains of their decedent." *See Christensen v. Superior Court,* 54 Cal.3dd 868, 894-95 (1991). California law also specifically imposes a duty on law enforcement officers to "refrain from exploiting gruesome death images by disseminating them to friends and family members or others with no involvement in official [law enforcement department] activities." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal.App.4th 856, 884 (2010). "*Catsouras* strongly supports the existence of a duty…with respect to the [officers] who took the photos of the victim and shared them with others." *Bryant v. Cnty. of L.A.*, Case No. 20-cv-9582-JFW, 2020 U.S. Dist. LEXIS 247113, at *16, 2020 WL 8024857, at *7 (C.D. Cal. Dec. 28, 2020).

*Brown v. USA Taekwando*, 11 Cal. 5th 204, 214-216 (2021) is inapplicable here. The special relationship inquiry applies where the plaintiff claims the defendant failed a "duty to protect from harm *caused by a third-party*. *Id.* at 213 (emphasis added). *Brown* does not apply where the plaintiff's injury arose from the defendant's affirmative conduct. Here, Fugate did not merely fail to stop others from exploiting the Romero crime scene images, Fugate did the exploiting. This is misfeasance, governed by § 1714's general duty of ordinary care. *Catsouras* also counsels against applying *Brown*. In *Catsouras*, the California Supreme

Court considered applying "the special relationship doctrine" and opted against it, noting that the "*Rowland* multifactor duty analysis" is the more common approach." *Catsouras*, 181 Cal.App.4th at 876. Applying *Rowland* while addressing the two officer defendants who e-mailed photographs that were ultimately seen by Plaintiff, the Court ruled that the "closeness of the connection is sufficient in this case to support a duty running in favor of plaintiffs, particularly in light of the weightiness of all the other *Rowland* factors." *Id.* at 885. Courts have continued to apply *Catsouras* after *Brown*. *See e.g. Moore v. Rodriguez*, 2021 WL 2222590, at *21-22 (S.D. Cal. June 2, 2021) (relying on *Catsouras* to find a duty to refrain from infringing on plaintiff's privacy interest in his psychiatric records).

The Court of Appeal in *Catsouras* found that the sharing of death images was "one of pure morbidity and sensationalism without legitimate public interest or law enforcement purpose." *Catsouras*, 181 Cal.App.4th at 874. The Court of Appeal held that the CHP and its officers owed plaintiffs a duty of care, even though the officers did not post images themselves. *Id.* at 884. Fugate tries to confine that holding to officers who personally post images on the internet. Besides being wrong on the facts of the case, Fugate's argument is wrong on the law. The duty recognized in *Catsouras*, to not exploit a decedent's death images for purposes unrelated to official business, is defined by the category of conduct, not by a particular medium of transmission. *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 772 (2011) ("*Rowland* factors are evaluated at a relatively broad level of factual generality") Fugate's conduct falls within it.

Applying the *Rowland* factors confirm the duty here. *See Rowland v. Christian*, 69 Cal. 2d 108, 117-118 (1968). The harm to a crime victim's mother from an officer's exploitation of her son's death images [redacted] *Catsouras*, 181 Cal. pp.4th at 883. Such a uty applies wherever the spectacle-ma ing occurs, whether

[redacted]

**B. Breach and Causation**

Whether Fugate breached the duty of care is a question of fact. Breach does not require, as Fugate [redacted]

Causation likewise presents a jury question. California applies the substantial factor test, under which a defendant's conduct does not need to be the sole cause of the harm. *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968-69 (1997); CACI Nos. 430, 431. The jury may find that Fugate's conduct was a substantial factor in Ms. Solares's traumatic distress because: (1) Fugate's images wee a source of the images she saw, and ;(2) Fugate's own exploitation of her son's death images are an independent source of profound harm to her. Where the defendant owes a duty directly to the plaintiff, damages for serious emotional distress are recoverable in a negligence claim. *See Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072-73 (1992).

## VI. INVASION OF PRIVACY

Plaintiff's invasion-of-privacy claim requires: "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 214 (1998). California recognized that "family members have a common law privacy right in the death images of a decedent." *Catsouras*, 181 Cal. App. 4th at 897. "The line is to be drawn when the publicity ceases to be the giving of information to which the

public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern." *Catsouras*, 181 Cal. App. 4th at 874 (quoting *Virgil v. Time, Inc.*, 527 F.2d 1122, 1129 (9th Cir. 1975)).

Public Disclosure: Defendant argues "Mr. Fugate did publicly disseminate or otherwise cause the publication of the subject death images." (ECF Dkt. No. 99-1 at 17, ll. 26-27) This is an admission. Fugate also argues he "did not show the images to anyone other than his professional partners, and he did so to process his own personal trauma." *Id.* at 17:28-18-:2. This is disputed factually, as a jury could find this explanation to be malarky. It is also wrong for two additional reasons: First, sharing with two non-ISU officers is public dissemination. No California case has defined the number of people necessary to justify a finding of publicity. *Kinsey v. Macur*, 107 Cal. App. 3d 265, 271 (1989). "The claim is not so much one of total secrecy as it is the right to define one's circle of intimacy." *Id.* at 272 (citation omitted). Recalling details to a small "classroom of peers, who will presumably be [] colleagues in her professional field" can constitute a public disclosure. *See Doe v. John F. Kennedy Univ.*, Case No. 13-c-1137-DMR, 2013 WL 4565061, at *11, 2013 U.S. Dist. LEXIS 122050, at * 38 (N.D. Cal. Aug. 27, 2013) (alleged disclosure to six classmates [redacted] that point: defendants did not post to the internet, but were the source of the images that were e-mailed around and eventually "spread across the Internet like a malignant firestorm." *Catsouras*, 181 Cal. App. 4th at 863.

Private Fact: Fugate does not dispute that the gory photos of Mr. Romero's mutilated remains are a private fact.

Offensiveness: *Catsouras* recognized that "a reasonable person would find defendants" disclosure of these [death] photographs to be offensive and objectionable." *Catsouras*, 181 Cal. App. 4th at 906.

No Legitimate Public Concern: as for the photos, Fugate admitted, "I shouldn't have had them on my phone. And I was being interviewed for it and I deleted them." (PMF 55.) Indeed, that was why he deleted them, "Because I was being interviewed for the photos, I did not want them on my phone, so I

deleted them." (PMF 55.) Fugate weakly offers that he shared them to "process his own personal trauma" (ECF Dkt. No. 99-1 at 18) but fails to offer any support that doing so, even if it were to be believed, constitutes a legitimate governmental interest. Whether this is even a believable claim is an issue for a jury.

## VII. SUPPLEMENTAL JURISDICTION

Federal courts "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Original jurisdiction over federal questions "carries with it jurisdiction over state law claims that derive from a common nucleus of operative fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (internal quotation marks omitted). Should Fugate prevail on Plaintiff's federal claims, the Court may retain jurisdiction over the negligence and invasion of privacy claims, which derive from a common nucleus of operative fact surrounding the taking and sharing of photographs of Mr. Romero's remains.

## VII. CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion should be denied.

Respectfully submitted,

Dated: November 20, 2026

LAW OFFICES OF JUSTIN STERLING

By: */s/ Justin Sterling*
Justin E. Sterling,
Attorneys for Plaintiff
Dora Solares

LAW OFFICES OF ERIN DARLING

By: */s/Erin Darling*
Erin Darling,
Attorneys for Plaintiff
Dora Solares